# EXHIBIT A

## TO NOTICE OF REMOVAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
*260 Adams Street Brooklyn, NYC 11201*

| | | |
|---|---|---|
| **MARY MOE** | ) | Index # 520441/2025 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | <u>AMENDED VERIFIED COMPLAINT</u> |
| | ) | |
| | ) | <u>JURY TRIAL DEMAND</u> |
| **Eric M. Horval** | ) | |
| **Justin R Horval** | ) | |
| **Chase Horval** | ) | |
| **Hells Headbangers Records** | ) | |
| **Shadow Kingdom Records** | ) | |
| **And Subsidiaries** | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

Now comes the Plaintiff, MARY MOE (herein after, "Ms. Mary" or "Mary"), hereby and herein alleges, as and for her Amended Verified Complaint against Defendants Eric M. Horval ("Eric"), Justin Horval ("Justin"), Hells Headbangers Records, Shadow Kingdom Records and subsidiaries (together, "Defendants") as follows and set forth in the attached Amended Verified Complaint, which is attached hereto and incorporated by reference herein.

Respectfully submitted,

/s/ *Mary Moe*
Mary Moe
Plaintiff, pro se
*Address Confidentiality*
King County, NY File # 327053

1

## PRELIMINARY STATEMENT

1.  March 3rd, 2022 The Defendants followed through on their years' long threats and published multiple explosive and defamatory videos about the Plaintiff to Justin Horval's YouTube channel, viciously attacking Mary with the "file" Eric Horval had threatened to expose Mary with, with intent to incite public contempt, ridicule, aversion or disgrace, against Mary and induce an evil opinion of her in the minds of right-thinking persons, which deprived Mary of their friendly intercourse in society and unjustly enrich themselves in the process.

2.  From the onset of these videos being released, and long before, Mary was faced privately with stalking, harassment, surveillance, physical assault, and emotional and psychological abuses by and through the Defendants and now, for years after, by the Defendants and through their 100,000+ mentally unstable, violent, white nationalist fan-base with the sole intent to discredit Mary, inflict public contempt, ridicule, aversion, disgrace, and induce an evil and untrustworthy opinion of her in the minds of right-thinking persons, and deprived Mary of their friendly intercourse in society and to unjustly enrich themselves in the process.

3.  The Defendant's went further and unleashed a years' long digital assault against Mary, using photographs of her to mock-up sexually explicit, derogatory, humiliating t-shirts without her knowledge or consent, fueling their public fanbase to gang-stalk and threaten Mary for years after their separation, to inflict public contempt, ridicule, aversion, disgrace, and induce an evil and untrustworthy opinion of her in the minds of right-thinking persons, and deprived Mary of their friendly intercourse in society and to enrich themselves unjustly both financially and reputationally. These acts were calculated to humiliate Plaintiff, cause emotional distress, and fuel further harassment, while generating profit for Defendants' record label operations.

4.  This was the pattern of punishment Eric Horval would levy against Mary from 2018 through 2024, to keep his control and her silence; that began when Mary was plucked from her

2

hometown and lured completely into Eric Horval's control 3,000 miles away from anyone she knew.

Throughout this period, Defendants engaged in stalking, surveillance, and harassment, both in person and

online, to deprive Plaintiff of her autonomy and silence her from speaking about the abuse.

5. Stalking and Harassment and illegal tortious crimes by the Defendants did not stop until Mary

was granted a temporary protection order June 20th, 2024 in Kings Family Court, File # 327053 and is

on-going.

6. Due to the circumstances, the court granted Mary Address Confidentiality. She remains in

hiding, with a current pending application for confidential name change as well.

7. Through this continuous pattern of conduct by the Defendants and through their influence from 2015

through 2024 Plaintiff has suffered physical injury, severe emotional distress and anxiety, humiliation,

embarrassment, post-traumatic stress disorder, economic harm and other consequential damages.

---

## **PARTIES**

8. Plaintiff, Mary Moe ("Plaintiff" or "Mary"), is a natural person and resident

of the State of New York. For her safety, Plaintiff's address is kept confidential under the New York State

Address Confidentiality Program pursuant to Executive Law § 108. Plaintiff has worked professionally in the

fashion and music industries for over 20 years, including wholesale account management, brand management,

artist and tour management, merchandise management and musician – all which require client-facing

interactions and heavily dependent on the Plaintiff's reputation for extraordinary work. As a result, her personal

and professional reputation is of critical importance to her livelihood. The Defendants were and are highly

aware of this which is why they attacked her credibility first. Plaintiff is a survivor of domestic violence,

stalking, and defamation perpetrated by Defendants, and brings this action to recover damages and obtain

equitable relief.

9. Defendant, Eric M. Horval ("Eric" or "Erik"), also known online as "Eazy E," "Eric Horrorval," and

Other variations, is a natural person residing in Medina County, Ohio. Eric is a digital graphic designer and

photographer who is also co-owner of Hells Headbangers Records and the sole owner of Shadow Kingdom

3

Records. Upon information and belief, Eric personally created and manipulated images of Plaintiff for use in unauthorized merchandise and defamatory publications. At all times relevant, Eric engaged in acts of coercion, assault, defamation, harassment, and exploitation of Plaintiff's likeness, both individually and in conspiracy with the other Defendants. Eric transacts business in New York and has intentionally directed defamatory and harassing conduct into this State through online platforms accessible to New York residents. To Plaintiff's knowledge, there are no publicly confirmed subsidiary companies owned by Eric beyond the named Defendants, but Plaintiff reserves the right to seek discovery related to any additional business entities through which Eric may carry out wrongful acts.

10. Defendant, Justin Horval ("Justin"), also known online as "J-Dawg," and other variations, is a natural person residing in Medina County, Ohio. At all times relevant, Justin acted in conspiracy with Eric by publishing defamatory videos on YouTube, disseminating false statements, and participating in the harassment and intimidation of Plaintiff. Justin transacts business in New York and has intentionally directed his wrongful conduct into this State. To Plaintiff's knowledge, there are no publicly confirmed subsidiary companies owned by Justin beyond the named Defendants, but Plaintiff reserves the right to seek discovery related to any additional business entities through which Eric may carry out wrongful acts.

11. Defendant, Hells Headbangers Records ("Hells Headbangers"), also known as "HHR" is a business entity organized under the laws of Ohio, with its principal offices in Medina County. Hells Headbangers transacts business in New York, including but not limited to the sale of music, merchandise, and online content accessible to New York residents. The music label releases primarily extreme metal music and merchandise which focuses on national socialist black Metal and death metal music and merchandise, holding partnerships with businesses in: Finland, Australia, Germany, Canada and Mexico that the Petitioner is aware of. The record label partners with a number of bands domestically and internationally. For the purpose of this case, the Defendants hold close personal and business relationships with Don Crotsley, aka "Don of the Dead" and Jaime Walters, aka "Althenar", owners of the predominate bands *Nunslaughter* and *Midnight,* incorporated in Ohio. The label has risen to fame in 2022 by using the exposure of their crimes Mary suffered, to publish an onslaught of sexually explicit, derogatory humiliating and illegal images and descriptions of Mary, in

4

2017 and 2022 through 2024. This was done to incite their most violent followers to collectively target, attack, harass, threaten and stalk Mary in her personal life and employment using her likeness as an effigy to humiliate, threaten, intimidate, and further harass Mary, in blatant retaliation for reporting the years long abuse suffered by Eric Horval and his family.

12. Defendant, Shadow Kingdom Records ("Shadow Kingdom"), also known as "SKR" and "ShadowKingdomRec," is a business entity organized under the laws of Ohio, with its principal offices in Medina County. SKR transacts business in New York, including but not limited to the sale of music, merchandise, and online content accessible to New York residents. They have been named sponsors on tours with events in Brooklyn, NY promoting bands signed to their music record label. Upon information and belief, Shadow Kingdom Records likewise participated in and profited from wrongful acts alleged herein. Defendant "Shadow Kingdom Records" is one of many known and unknown subsidiaries and DBA businesses purchased by the Defendants with the intent to funnel and expose fans of traditional rock and heavy metal music with less political, more benign, musical interests, to neo-fascist, violent, white nationalist ideologies and propaganda released by Hells Headbangers, which the Defendants directly profit from and though various revenue streams including: online distribution, manufacturing partnerships, domestic and international trade partnerships, vendor booth sales various music festivals around the county, and through partnerships with international independent music record labels.

---

## JURISDICTION AND VENUE

13. This Court has general jurisdiction over Defendants pursuant to CPLR § 301, because Defendants conduct continuous and systematic business activities within New York State, including the sponsorship, promotion, and distribution of music and merchandise through their entities Hells Headbangers Records and Shadow Kingdom Records, as well as ongoing commercial collaborations with New York–based musicians.

A foreign corporation is subject to jurisdiction where it engages in a continuous course of business within New York.

14. This Court also has specific jurisdiction over Defendants under CPLR § 302(a)(1), which confers jurisdiction over non-domiciliaries who "transact any business within the state" so long as the cause of action arises from those transactions. Defendants transact business in New York by:

a. Sponsoring and promoting live music events in New York City, including the June 17, 2023 concert at TV Eye in Brooklyn, where Shadow Kingdom Records' logo appeared on the promotional flyer for a band signed to their label on tour. A true and correct copy of this flier found through public records is annexed hereto as **EXHIBIT 1**

b. Selling and distributing music and merchandise into New York via online platforms and label partnerships as referenced in this true and correct copy of a published article, dated 2017, by *"MetalSucks.net"* Titled, "_An Open Letter to Hells Headbangers Records to Stop Releasing and Distributing Metal by White Supremacists_" found through public records is annexed hereto as **EXHIBIT 2**

c. Publishing and distributing videos within New York City, including the March 2nd and March 4th, 2022 YouTube releases seen by residents of NY. A true and correct copy of these two videos found through public records are annexed hereto as **Exhibits 3 & 4**

d. Maintaining ongoing commercial ties with New York–based artists, including Will Rahmer of Mortician (Yonkers, NY), with whom Hells Headbangers Records has distributed and released musical works for years. A true and correct copy of the HellsHeadbangers.com website who sell and manufacturer products by New York based "Death Metal" Band, Mortician. This screen grab was found through public records are annexed hereto as **Exhibit 5**

6

e. Facilitating the attempted illegal international entry of a band, Warmoon Lord, through New York Customs Border Patrol whom the Defendants manufacture and distribute their music in New York in collaboration with another known Neo-Nazi in Finland, Lauri Pentilla of Werewolf Records. A true and correct copy of the Hells Headbangers Instagram webpage illustrating their connections to known individuals whom the NY CBP banned from entry into the United States is annexed hereto as **EXHIBIT 6**. A true and correct copy of the New York Customs Border Patrol recorded statement by band member of Warmoon Lord is annexed hereto as **EXHIBIT 7**. In it, the individual acknowledges ties with White Nationalists. They were subsequently rejected from entry indefinitely and sent back to Finland. Subsequently, as of September 2025, Lauri Pentilla's visa has recently been denied for entry into the United States. The Defendants are Collaborating and funding terrorist organizations.

15. These transactions demonstrate purposeful availment of the privilege of conducting business in New York, and Plaintiff's claims for defamation, harassment, and exploitation of likeness arise directly from Defendants' business activities and reputation in the New York music industry. Jurisdiction proper where the defendant purposefully availed itself of New York commerce.

16. This Court also has jurisdiction under CPLR § 302(a)(3), which permits jurisdiction over a non-domiciliary who commits a tortious act outside New York that causes injury within New York. Defendants published false police reports and defamatory statements online, including on YouTube, that were intentionally directed at Plaintiff while in New York and were consumed by New York residents. Defendants knew or reasonably should have known that their conduct would have consequences in New York, Plaintiff resides and where Defendants regularly conduct business. - Jurisdiction is proper under § 302(a)(3) where out-of-state conduct causes injury in New York and defendant derives substantial revenue from interstate commerce.

17. The injury to Plaintiff in New York is demonstrated by, among other evidence, a September 8, 2022

7

written communication from New York–based musician Will Rahmer, in which Rahmer declined

to work with Plaintiff due to the false narrative spread by Defendants. This shows Defendants' defamatory

conduct interfered with Plaintiff's professional opportunities in New York's music scene, constituting

cognizable injury under CPLR § 302(a)(3). A true and correct copy of communication between Mary

and Will Rahmer is annexed hereto as **EXHIBIT 8.**

18. Venue is proper in Kings County under CPLR § 503(a) because Plaintiff is a resident of Kings

County. Venue is further proper under CPLR § 503(c) because a substantial part of the events giving rise to the

claims occurred in Kings County, including the June 20, 2024 order of protection issued by the Kings County

Family Court and the July 18, 2024 hearing at which Defendant Eric Horval was observed attempting to record

court proceedings in violation of rules. A true and correct copy of the Kings Family Court June 20th Order is

annexed hereto as **EXHIBIT 9.** A true and correct copy of the Kings Family Court June 20th Address

Confidentiality Order is annexed hereto as **EXHIBIT 10.** A true and correct copy of the Kings Family Court

July 18th Court Transcript is annexed hereto as **EXHIBIT 11.**

19. Accordingly, this Court's exercise of jurisdiction comports with due process and the CPLR, as

Defendants have purposefully availed themselves of New York commerce and intentionally directed tortious

conduct at Plaintiff while she resided in New York.

---

## FACTUAL ALLEGATIONS

20. Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs as if

fully set forth herein.

21. Plaintiff, Mary Moe, is a professional in the fashion and music industries, having worked in various

positions including: wholesale account management, brand management, artist and tour

management, merchandise management, musician and booking agent. Her professional reputation

and relationships are central to her livelihood and the means by which she supports herself.

8

## I.  Initial Contact between Mary Moe and Defendants

22. Mary met Eric Horval in August 2015 through email initially. Mary was building a career as a booking agent and tour manager in Los Angeles, CA, supplementary to her fashion career.

23. An agreement was made between E Horval, Hells Headbangers and Mary to book a short tour leading up to their fly one of their Cleveland, Ohio final performance, cumulating at the Defendant's festival, Hells Headbash II, September 2015.

24. At the music festival, there was an assault by one of the artist's she was managing, against a woman.

25. Mary was visibly upset and shaken, to which Eric Horval immediately identified her vulnerable state and sought to take advantage of her. Mary was naïve and unprepared to process the violence she witnessed.

26. Eric Horval spent most of the evening pulling Mary into private spaces, to ask very personal questions, unrelated to work or music, wanting to "get to know" her better. He seemed to take a special interest in Mary.

27. Within days of returning to Los Angeles, CA, Mary received a text from Eric Horval, expressing how he would like to work with Mary again in the future.

28. Mary's innocence and naivete laid the foundation for Eric Horval's manipulative and coercive romantic and sexual relationship with Mary, a single mother, raising a disabled child and whose father had recently passed away.

29. Within weeks, Eric Horval flew to Los Angeles, CA to meet Mary, under false pretenses Of expanding their business into California.

30. Mary was elated, she was a newer booking agent and a bit star-struck by the power and influence Eric Horval's business held and attention he was showing Mary.

31. She assumed this would be a friendly visit, as she had coordinated with other colleagues in previous Similar arrangements.

32. Upon arrival though, Eric Horval wasted no time. Although the parties had never been romantic,

9

He did not hesitate to immediately greet Mary by grabbing her around the waist, pulling their bodies together as he tried to forcibly kiss Mary. Mary's body tensed, she was frozen and worried if she rejected him, it would ruin the work opportunity.

33. Eric Horval took Mary to a lavish downtown restaurant, which ended at a local music venue. He was immediately recognized and asked to participate in an interview, to which he declined.

34. Throughout the evening Eric Horval kept buying drinks for Mary, and progressively increased his groping, to her embarrassment. She felt immense sexual pressure. Several times, Mary had to slowly remove Eric Horval's hands from her, or position her purse in between them. She became too intoxicated at one point and wanted to go home. Eric Horval offered to drive her car.

35. When they returned to her home, Mary was not able to walk and started to fall asleep in her clothing.

36. Eric Horval undressed Mary, and preceded to have sex with her, up to and after Ms. Mary lost consciousness.

37. The following day, Eric Horval complained to Mary about giving him "blue balls" and told her she needed to "finish the job". His tone went from joking, to serious and short.

38. She gently suggested he masturbate in her bathroom, to which he scoffed and just stared at her, Smirking while holding his erect penis out.

39. Mary felt immediate pressure to comply, the silence was awkward and he wasn't acknowledging Mary's subtle rejection.

40. She complied but felt the weekend had been ruined and she had been baited.

41. It was clear the opportunity Eric Horval was offering her, was sexual in nature, and conversations quickly shifted to working with their company "down to line".

42. Under of the guise of caring for her well-being, Eric Horval would request she call him daily on Video after work. If she attempted to, or did, change this "daily" routine, his tone would be disapproving. He would demand to know who she was with, particularly within music spaces.

43. Eric Horval made it clear, he didn't feel comfortable with Mary interacting with mutual acquaintances and asked her to stop. Any friends he didn't know or didn't approve of, he told her to cut off.

## II. <u>Eric Horval Lures Mary into a Relationship</u>

44. Eric Horval would frequently "mirror" Mary's deepest relationship desires, baiting her with hope of re-building the family she had recently lost, in exchange for more control of her autonomy.

45. He would place guilt on Mary to set aside her needs in lieu of his "image" and to protect him from "embarrassment" if she wanted the relationship to progress. He said any men she knew, "just wanted to fuck" Mary, nothing more and routinely shamed Mary for being so naïve.

46. Eric Horval would force Mary to center herself around his life and priorities, telling her many times, not to forget, by proxy she was now representing him and his business, although Mary was not being offered any meaningful role within the organization.

47. Mary was isolated, vulnerable and alone. She began to depend solely on Eric Horval through an erosion of her support system and demands she limit her online communications.

48. Within less than a year, Mary found herself surrounded almost exclusively by Eric Horval's inner circle, completely removed from anyone she had known.

49. August 2017 Mary was flown to Ohio. Eric Horval made a grand gesture and presented her with a 3-foot framed collage of photos, and said he wanted her to move in with him. He described in detail how he wanted to build custom house and it would be a great thing to start working towards.

50. Mary was lured by the promise of a serious long-term relationship and promise of integrating into his family business if I continued to obey his demands.

51. December 17th 2017 Eric Horval shipped Mary's belongings and flew Mary and her son to Medina, Ohio.

52. Mary and her son would not return to their home state ever again.

### III. Eric Horval exerts control over Mary's personal life

53. From the onset of their relationship, Eric Horval exerted his power and influence over Ms. Mary. This unequal dynamic was fueled by their very different socio-economic and family backgrounds as well as their relative positions in the music industry. Eric Horval was considered a wealthy and secretive record label owner and graphic designer, whereas Mary, a small independent booking agent, unknown on a national stage, whom people knew very little about in regards to her son or career.

54. Throughout Mary's life, she had been targeted by society for the challenges she faced raising a disabled child as a single woman with no family. It was common-place for people to shame, humiliate and degrade Mary. She adapted by keeping these details strictly between Mary's family and rarely let people close enough to learn anything significant about her or her son. Eric Horval would go onto routinely threaten and degrade Mary later, for exactly these challenges.

55. March 2016 was the last official tour Mary coordinated in the Music industry. Eric Horval, although working in the industry himself, demanded she stop all scheduled work at that point or he threatened to "dump" her. He degraded her saying he didn't want "some metal whore" and wanted her to focus on her fashion career exclusively, apart from his world or anyone he knew. Eric became paranoid of Mary talking to anyone about him, his business or family. There was immense pressure and demand to change entirely who she was, in order to appease him.

56. In May 2016 Hells Headbanger was vending a festival in Maryland. Mary was scheduled to go with them. Upon arrival she ran into an old friend in the music industry, Cecil, who preceded to fit her with an "artists'" backstage pass, which is different from a "vendor's pass". When Mary returned to the booth Justin's wife was furious, asking "where the fuck have you been" when Mary explained that she held her own contacts in the music industry and showed her the artists' pass, Lindsey called her a "whore".

57. Mary was deeply affected by this, began to cry and did not leave the booth again the remainder of the festival at the Defendant's demands. She felt frighted of the vindictive, retaliatory nature of the Defendants.

58. Eric Horval would routinely threaten Mary, reminding her, nothing she did, even while Traveling would not "get back" to him. If she dared try to attend any concerts, her behavior, who she was with and what she was wearing would be recorded. One time, in Chicago, Mary tried to meet up with an old friend from Los Angeles who was performing. While there, someone took a photograph of her and sent it to Eric.

59. In retaliation, through Eric's influence his sister began an onslaught of petty rumors, directed at anyone Mary were acquaintances with in music, further isolating her from any social community or networking. These rumors sought to "expose" Mary as having body dysmorphia and anorexia using their implied knowledge of Mary through Eric Horval. It frightened Mary how easily he was able to sway people's opinions using the implied credibility he held and sponsorships paid out through his business.

60. Sometime in August 2016 Mary was visiting Eric. A huge argument erupted in the car to which Eric lashed out and struck her saying "fuck you" – Eric called police on Mary and gave a false account and they dismissed Mary entirely. When they left, he told her that this wasn't Los Angeles and no one "gives a shit" about some "hysterical girl". This was the first time Mary would see the more sinister side of Eric Horval. Soon after, Mary fled his house back home.

61. This pattern of threat by law enforcement would continue onto the end of the relationship. It was at this point, he showed her his Shotgun and handgun. He said in these rural areas, it wasn't uncommon for people to just go missing. Mary interpreted this as a threat to her life.

62. Mary fled back to Los Angeles several times. Each time she left though, Eric Horval would resume love-bombing Mary and preying on her vulnerabilities and insecurities. He would increase the pressure and manipulation, degrading her for her son saying she was "bottom of the barrel" and she should be grateful for the life her was offering her. He would laugh at her many times saying, "if people only knew how pathetic you really are…" This drove Mary to frequent crying spells and depression. Eric would demand she do more to accommodate his "obligations" to his company and "make his life easier".

13

63. Mary was frightened to disobey him, she felt she had no other choice. If she tried to leave Eric Horval would threaten to ruin her reputation over and over.

64. On or around May 2017 Eric told Mary he wanted her to participate in a dress rehearsal of a photo he was going to shoot with Jaime Walters from the band Midnight. Mary agreed but made it clear that she did not want to be associated with the project. Mary protected her name above all else, as it was her calling card in the fashion industry. Any previous work done in music was under the alias "HxR" and never her legal name.

65. During the shoot Eric asked Mary to take her clothes off. This made Mary uncomfortable, but her reservations were dismissed and ridiculed. Eric Horval preceded to pull her aside privately, and order Mary to have a few shots of Malibu Rum to loosen up, he told her not to embarrass him and that the photos "were only for inspiration anyway".

66. August 2017 Eric Horval presented Mary with an elaborate framed collage of pictures of them. He said it was time she moves to Ohio. Mary declined his advances at first. She did not want to live in his home, she felt frightened of living with him full time and the extreme amount of surveillance she was already under or the lack of security she would have. Eric offered to buy a piece of land with her, if she moved in with him. But once moved in he demanded he pay her money to save for it.

*67.* Sometime near September 2017 an article was published on, www.metalsucks.net titled, *"An Open Letter to Hells Headbangers Records to Stop Releasing and Distributing Metal by White Supremacists"* detailing the Defendant's connections to a man named Lauri Pentilla, owner of Werewolf Records, in Finland. When Mary googled this man's name, she found an article based out of Glasgow titled, "Band linked to neo-Nazis play secret Glasgow" from the year prior. Mary became frightened. She understood this to be the reason why the Defendants were always threatening her with exposure (a nobody).

68. Mary gained the courage to ask Eric Horval privately about this business connection. Whether it was true. He told her no one would know, if she didn't talk about him and demanded she stop all posting entirely.

69. A month or two later, the Defendants hosted this man in Ohio for a performance. Mary's

14

labor was frequently exploited by Eric Horval. He demanded she help him with his business, at only the lowest levels, without pay, despite her career experience. Mary was told that night to go to the hotel to assist with "a problem". Lauri Pentilla had beat his girlfriend, Rebecca, in their hotel room. Rebecca was in the hotel lobby crying. Her face was swollen and red. Everyone affiliated with the Defendants looked away and there was only silence. Mary was frightened. She felt trapped in this violent world now, but unable to leave without consequences.

70. It became clear Mary's son was not safe in Ohio around the Defendants. She changed her plans, after witnessing the ridicule her son faced by them at their Christmas party. Eric's brothers Justin and Craig, ridiculed his interests, mocked his clothing, and body shamed his appearance unbeknownst to him. Chase Horval would refer to autistic people as retards. She decided it was best she relocate to Maryland. Her work had her scheduled to leave for an 8-week tour and Mary did not feel comfortable anymore.

71. The intentional, derogatory and hateful comments began to take a toll on Mary. When she was away, Eric would threaten and warn that he held disdain for woman who posted photos of their bodies online, when she would visit, there was always some deception and provocation.

## IV. Defendants Illegally Publish Sexually Explicit Photo of Mary

72. Shortly after, Mary discovered the "inspiration" photo Eric Horval asked Mary to help with, was actually published, in print, with Mary's full legal name and the word, "Aggressor", by Eric Horrval, without her knowledge or consent on Jaime Walter's Album "Sweet Death and Ecstasy". Ms. Mary was distraught, she was not able to cope and started vomiting. The repercussions this would have on her career would be huge if discovered. A true and correct copy of the Midnight back album cover and insert is annexed hereto as **EXHIBIT 12.**

73. Eric Horval just laughed and said, "That's what you get. Maybe now you'll learn." Mary Told no one about this photo and tried to have her name suppressed, but could only do so much.

## V. <u>January 18 2018 Fight in Seattle Hotel</u>

74. This led to a fight in January 2018 in Seattle. Mary was attending her best friend's wedding, Bettina. Eric Horval wouldn't let her go alone, and inserted himself into their event offering to be their photographer. He was rude and critical of Mary in front of her friend, making backhanded comments about her weight. At one point her grabbed her by the arm and dragged her into a corner. He threatened to show everyone the picture if she wouldn't stop "embarrassing him".

75. The rest of the night, Eric Horval preceded to ignore Mary and make inappropriate comments to the female guests. Mary could no longer contain herself and burst out in tears. She went outside the reception hall and apologized to Bettina and fled back to her Hotel without Eric Horval.

76. Eric Horval arrived back to the hotel room much later. When he entered, he went straight towards Mary who was already asleep. He ripped off the blankets and started berating her again, Eric Horval called Mary "Pathetic" and "Common". Mary stood up and he threw her down on the bed, packed his things and left.

77. Mary went back to Maryland and not long after Eric called her again, each time using the same tactic to prey on her vulnerabilities and isolation. He convinced her to go back to live with him, or else.

78. Mary was working remotely for the entire month of May 2018 at Eric's house. He kept sneaking away, being secretive and she suspected there was more to the situation. Mary finally confronted Eric Horval. He preceded to gaslight, calling her "needy and paranoid". He deflected from the accusation, accusing her of not letting him work. Mary in her frustration, dropped a pan of eggs she was cooking, for Eric Horval, on the floor. Eric called the police, who took no concern for Mary and threatened to have her arrested. A true and correct copy of the May 23rd, 2018 police report is annexed hereto as **EXHIBIT 13.**

## VI. May 2018 – Mary's Discovery of Stolen Funds to Buy Property

79. Mary discovered soon afterwards, Eric was actually in escrow for a property of land using the money they pooled, purchased May 29th, 2018, essentially cutting her out of any legal authority and stealing the money she saved. Mary was again blindsided and distraught. Eric knew he was deceiving Ms. Mary. When she confronted him about this over the phone, he offered zero explanation and refused to return and talk in person. A true and correct copy of Defendant's May 29th, 2018 property purchase, found through public records is annexed hereto as **EXHIBIT 14.**

80. Soon after the police arrived to where Mary was, claiming Eric had reported Mary was suicidal. Mary felt frightened to be in Eric's house any longer and fled to Maryland to be with her family. He kept draining her time and now the future she was saving for, was gone. A true and correct copy of the May 30th, 2018 Police Report is annexed hereto as **EXHIBIT 15.**

81. This devastated Mary and deeply affected her mental health and self-worth. She was isolated and had thrown all her focus into building this relationship, forgoing her musical Aspirations, sacrificing her social life entirely to Eric Horval's benefit and moving nearly 3,000 miles to accommodate his business priorities. Both parties withdrew from the relationship but still resided together. He claimed the money she gave him would be put towards bills and was entirely unapologetic towards the deception.

82. At a certain point Mary discovered by accident Eric had retained Mary's social security number on his computer as well, she quickly deleted it.

---

## VII. Eric Horval forces Mary to take Plan B / Threats made by His Brother Chase Horval

83. Sometime in summer Mary's period was late. Eric Horval did not hesitate. He went to the store and brought home a Plan B pill and forced her to take it in front of him.

84. Early October 2018 Eric and Mary attended an event in Cleveland Ohio for the Midnight album release party at the Agora theatre. Eric and Justin's brother and 3rd owner of Hells Headbangers arrived

17

He immediately approached Mary and began screaming in her face in front of a crowd of people. He told her to "Go back to California! Noone likes you and no one wants you here!" Eric stayed silent only grabbed Mary's arm and stopped her from walking away, but did nothing to stop his brother's attack. Mary was left frightened and nervous. She felt totally isolated in a full room of people. Mary sat at the booth without speaking to anyone the rest of the night.

## VIII. Eric Horval Threatens Housing Security

85. In late October 2018 Eric blindsided Mary once more. While she was away for a work at a tradeshow, Eric Horval called her. He had packed up her belongings and decided it was time they took a break. No discussion. Mary was not due to return to Ohio for nearly 2 weeks. This instability deeply affected her work performance. She could not continue coping with the rapid betrayals, constant surveillance, constant hostility and threats. She had no friends, no life and was totally under Eric Horval's control. She faced the same retaliation over and over.

## IX. Eric Horval lures Mary back to Ohio 2019

86. From November 2018 through June 2019 Mary resided with her family in Maryland. That was again when Eric began love-bombing Mary. He seduced her with the same promises as before, but Mary refused initially. But he increased his manipulation over her and demanded she buy the property he told her to or she was "stupid".

87. Escrow closed May 29th, 2019 and Mary moved into her home sometime in June. It was only a matter of months before Eric demanded to live with Mary. A true and correct copy of Ms. Mary's property purchase is annexed hereto as **EXHIBIT 16.**

88. In November 2019 Eric and Mary traveled to Atlanta for a festival he was attending, Ms. Mary sat in the back and did not engage, as per his demands to stop interacting with anyone. While on their way home, he ordered her to wear a ring from now on.

18

## X. **Mary is under surveillance by the Defendant's Family**

89. A few days later, Mary saw a photo text on his phone from his mother. She had screenshot Mary's profile page. Rita text – "what is this?" Mary became frightened. She was always being watched and she never felt safe. Two different Eric Horval personalities began to emerge once Ms. Mary had bought her house. More distant and even more deceptive and cold.

## XI. **Eric Horval steals Mary's Car and Lives on Her Property while She Recovers from Surgery**

.

90. December 2019 Mary injured her ACL ligament which required surgery. Eric's Family went silent and Eric was completely cold. Mary went back to Maryland for surgery.

91. While Mary was at her family's house unable to walk, Eric Horval lived in Mary's house. He was driving her car and did not own a vehicle of his own. He would make up excuses and would only come out for short periods. Distant and cold, he was withdrawn much of the time, seemingly depressed.

92. At this point Mary was in a leg brace attending rehabilitation from her surgery. She needed Eric Horval to bring her car to her and help relocate her son due to the pandemic. Instead, his mother called Mary and thought it was best she "stay with her family".

93. Mary told Eric if he did not bring her car, she would report it as stolen. That this was an emergency and really confusing to Mary. That is when Eric Horval came to collect Mary and her son from her family's house in Maryland. Eric offered no explanation, just silence. He was completely dismissive of Mary's concerns laughing at the "political hoax".

## XII. **Eric Horval Withholds Food from Mary and Her Son During Covid.**

94. March and April 2020, Eric withheld food from Mary and her son until Mary was

19

forced to apply for SNAP benefits and register at food banks. Mary felt shamed, embarrassed and confused by Eric Horval's behavior. It was cruel and demeaning. She and her son were isolated without a support system in Ohio, by his doing.

---

### XIII. Eric Horval begins inappropriate conversations with one of his employees, Taylor.

95. June 2020 – It was revealed thru pure coincidence Eric had secretly hired a girl, Taylor, in December 2019. Mary questioned why they were rejected for the position, when it could have really helped them Financially at a critical time. She questioned why he never mentioned Taylor and if it was reason he was now at the warehouse so often. Eric flew into a rage, refusing to explain himself. He became erratic and threatened to leave, telling her he didn't need to tell her anything. He then preceded to start rushing around, packing his things with boxes he had been secretly gathering.

---

### XIV. Eric Attempts to Block One of Mary's Windows from Locking

96. Mary's son became very triggered and upset. Mary took her son upstairs and spoke to Eric privately. She asked Eric to please allow her to leave with her son, that he was able to enter the house while we were gone. He agreed and Mary went upstairs until he had left.

97. While Mary was preparing to drive back to Maryland with her son, she instructed him to go around and make sure all the windows were locked. He could not close one window at the front porch. When Mary inspected it, she found a small white wooden block in the crevice of the window seal. It had been cut with a saw, similar to what Mary had seen Eric working with in the garage.

98. Mary was thrown into a panic and extremely frightened for her and her son's safety. She perceived this as an attempt to break into her house and needed confirmation.

99. Mary called Eric on speaker phone in front of her son. She begged to know if it was in fact him who planted this wooden block. Initially he attempted to gaslight Mary. She begged him to tell

20

the truth as it had now seriously thrown her into a mental health crisis. Mary was crying and shaking feeling her home was being targeted for a break in or worse. After a long silence Eric finally admitted, yes, he had planted the block. She wanted to know why, but said they could discuss it at a later time. Before leaving, she asked her son to please write down what he found in the window and what he heard. A true and correct copy of Mary's son's original written statement and wooden block are annexed hereto as **EXHIBIT 17**

100.    Mary stayed with her family for a few weeks before returning to Ohio with her son.

## XV. Eric returns again luring Mary with a business opportunity

101.    Eric Horval did return to Mary's house shortly after. This time with a business opportunity, he wanted to branch into women's wear band merchandise and he wanted my help to launch it. The band, Incantation, contracted to launch an entire line with Hells Headbangers and Eric.

102.    Believing this was again a genuine promise of a long-term future, Mary agreed and Eric moved back into the house. Eric requested to take photographs of Mary in a blank t-shirt for the line at his warehouse.

103.    During this time, Mary was isolated with Eric and her son exclusively. She distracted herself by throwing all her energy into her son's well-being and this clothing business. She blinded herself to Eric's coldness and his family's abuse, desperately believing this was a way of life she had to adapt to, if she wanted a family.

## XVI. Eric Plans Secret Vacations Without Mary Knowledge

104.    December 2020 Mary had discovered through their chiropractor Eric had been inquiring With them about their co-ed wellness retreat to the Bahamas. They assumed she knew, but she did not.

105.    When Mary asked Eric about this, he initially tried to gaslight Mary and lie. When she requested they visit the doctor together next time, he admitted to yes, wanting to take a trip alone.

21

106.    Eric claimed he needed a break, but she felt there was more he wasn't telling her. The amount of betrayals had taken their toll. The lying, gaslighting, secret women, secret purchases. Mary questioned if they were even in a relationship at that point. Eric was silent and cold. He told Mary he thought she was "pathetic". That she had no family "pedigree" and he was tired of dating women who had medical issues.  Mary was emotionally distraught.

107.    Eric again moved out right before Christmas. Mary was isolated with her son and began to seek therapy.  Mary believed his actions were cruel and psychologically she never fully recovered from the emotional abuse he inflicted.

## XVII. Eric Horval Assaults Mary's Autistic Son

108.    March 2021 Eric Horval, again, manipulated his way back into Mary's house. The instability did not sit well with Mary's son. He did not want Eric to return but Mary was lured with the hope once again of a long-term future with Eric Horval.

109.    Mary was actively interviewing with Brighton Collectibles for a Sales Executive role representing them for the state of Ohio. It was scheduled she would fly to Dallas for the interview.

110.    A few days before the flight, Eric physically attacked and assaulted Mary's Autistic son beating him and injuring his mouth in an ordeal that lasted nearly 10minutes. Mary's son called 9-11. The Medina PD who came to the house. They dismissed her son entirely, although having damage to his mouth. Mary felt trapped and frightened by Eric Horval without anyone to turn to at this point. A true and correct copy of Mary's March 2021 Police and initial 911 call are annexed hereto as **EXHIBIT 18**

111.    Mary asked her son to please stay away from Eric and her flight returned the same evening.

112.    Mary felt Eric Horval was ashamed of her son's disability.

113.    She began to have nightmares and lived in a constant state of fear of the Defendants threats. Eric Horval was actively working to hurt Mary's reputation while they were together, thus

22

undermining her financial security, trapping them in Ohio and under his control.

## XVIII. Harassment by Defendant's family

114.    At the Horval family Easter party harassment increased. As they welcomed Eric and stood in silence just staring at Mary. Justin's wife commented "You have some nerve showing your face here." Then all the women preceded to sit away from Mary. She stayed only 30 minutes then requested to leave. Mary and her son did not attend another of their parties ever again. This took a heavy toll on Ms. Mary. There was no acknowledgment for the abuse she was suffering in and no one would listen.

115.    Mary tried to leave the relationship again. Mary needed to stabilize her son thru a traumatic time. Eric Horval had now affected her son's mental health negatively after assaulting him.

116.    Her son had frequent nightmares, his behavioral issues increased towards Mary. Ms. Mary tried to remedy this by getting him hired at the local grocery store, his first job and connecting him with social services to meet peers and develop adaptive routines. There was no support from Ms. Mary's family.

117.    Bravely, Mary tried to breakup with him, but he would not leave. He told that if he left it would be very bad for Mary. The he told her he had big plans for her 40th birthday, and it was not the right time, silencing her completely.

118.    Eric's family attempted to increase harassment, but Mary went no-contact. She focused exclusively on her work, therapy and her son and his well-being and tried to stay away from Eric Horval.

## XIX. Mary's 40th Birthday Ruined by Defendants

119.    Eric took Mary to Columbus, Ohio for an overnight weekend stay April 22-24th 2021 for her 40th birthday. She had no friends, no family. How Eric wanted her. Isolated.

120.    Eric proposed, pulling her onto his lap and offering her a wrapped gold box with a ring inside. At dinner, conversation was minimal and Mary felt uncomfortable. The entire evening felt

23

forced and unnatural. A performance.

121.    Mary again confronted Eric Horval and attempted to end the now engagement. But he threatened her with self-harm. He threatened to drive the car into traffic. Mary complied and agreed to wear the ring. He told Mary he struggled with self-image and self-esteem issues. He was erratic with a desperation telling her they were "so close now".

122.    Mary understands now, he was only manipulating her emotions to control her. He needed to end the relationship on his terms for his reputation and to discredit Mary later.

123.    Bettina rightfully questioned the motivation behind this ring. She noted that for someone as wealthy as him, the ring was inappropriate in value. She warned Mary this looked like manipulation.

## XX. Mary uncovers Defendants secret relationship w/ employee and financial ties to Lauri Pentilla.

124.    Early June 2021, Mary prepared her son to relocate back to Maryland due to his mental state and ongoing emotional abuse. Mary was slowly preparing to leave Eric.

125.    Eric began acting strangely. Mary found a bottle of Rum hidden in the kitchen. After the articles came out in 2017 Eric stopped communicating with Mary about his record labels.

126.    Mary suspected Eric Horval was having an affair with Taylor, the girl he had hired December 2019. She looked though his computer.

127.    In Eric's emails it appeared he was in fact working with Werewolf Records and Lauri Pentilla, the known white supremist and Nazi. Eric was manufacturing all the records at Eric's cost even, striking a larger distribution partnership to expand Lauri's and Hells Headbangers reach in Finland and the USA.

128.    It showed Eric lent his brother, Craig Horval, $50,000 to buy a house, at the same time Eric was living with Mary and withholding money for food from her and her son at the onset of the pandemic until she was forced to apply for welfare.

129.    He was in fact, having inappropriate conversations with Taylor.

130.    Eric also had a secret file in his note's app, mislabeled as a recipe but had an ++ in the title. The note contained a Facebook profile name and password. When this account was opened, he had been stalking his ex-girlfriend in November 5th 2018.

131.    Eric had not disabled his dating profile "Emperor666"and was actively seducing women online Taking thousands of dollars of money in investment schemes.

## XXI. Mary Discovers Secret Voice Recordings and Further Financial Deception

132.    There were secret voice recordings, one of a meeting with his insurance provider, cutting Ms. Mary out of his life insurance policy.

133.    All of this collectively devastated Mary. She confronted Eric and this time would not take no for an answer. She wanted him to leave her house. He started to cry and shake and said there was "Something wrong with his brain" and he felt sick. He told Mary he doesn't know why he did these things. He preyed on her empathy Mary demanded Eric seek treatment either medical or behavioral.

## XXII. Mary Confides in Her Neighbor About the Findings and Abuse

134.    She finally reached out to the only person she felt she could talk to, her neighbor, Amy. Ms. Mary opened up about finding some really disturbing things. Amy was supportive and helped Ms. Mary in a difficult moment process what was unfolding and encouraged her to leave.

## XXIII. Eric Horval Rapes Mary (again)

135.    On July 9th – Mary returned home from work. Eric came into her bedroom and suggested they watch a movie together, "Unhinged" (2020) about a man who stalks a single mother and her son. The movie was violent and graphic. Mary became extremely frightened and scared of Eric Horval. She

25

interpreted this as a threat to hear leaving. When she asked to please watch something else, Eric proceeded to start a TV show about a struggling couple with a young son, who bring another woman into the home.

136.    At that point Mary began shaking and crying, unable to cope. She asked him why he would suggest these movies. What the meaning was behind them? She asked to see his phone. He made to attempt to hide.

137.    Eric Horval then threatened her. He told her didn't matter anyway. No one would believe her and no one would care. Mary became distraught, crying and defeated.

138.    He ordered her to lay down on the bed and take her robe off.

139.    Mary was crying and distraught, frightened of Eric Horval. He got on top of her and began having sex with Mary. Mary laid motionless until she realized what has happening and began to struggle, he told her to stop moving, she told him to get off her.

140.    As he was seemingly getting up, he grabbed Mary's right arm and pinned it under his knee. Then he quickly did the same with her left arm. He proceeded straddle Mary and masturbate until climax, in Mary's face. His expressions were angry and frustrated but there were no words exchanged. Just grunts and silence. Mary was frozen.

141.    Mary was now very sick and confused. This was not anything she could process. The following day Mary broke down crying, accusing him of raping her and was hysterical. He offered no explanation, just silence. Mary left her house and upon returning a few hours later, Eric had packed up everything. Even the mattress was in the garage. Boxes stacked. Mary had a mental breakdown at that point and began screaming "What is going on!?"

142.    Eric Horval offered no explanation, instead, he called the police. He proceeded to file another false police report. Mary was not of sound mind; she was frightened of the threat of police by Eric and their pattern of gender bias. She was barely able to ask the female officer for a protection order, no one listened.

143.    Instead, Officer Erika Anderson, lied. She attested to witnessing Mary hit Eric. Her bodycam and police vehicle showed no truth to her statement. But it didn't matter in the moment. She was also

26

seen changing Mary's statements, but there has been no accountability.

144. Mary hired 2 attorneys who convinced her to take a "disturbing the peace" charge to quickly move forward and seek treatment for the abuse. This was Mary's first and only criminal anything. It frightened and confused her greatly. No one cared, just as Eric Horval had threatened.

145. Mary had to quickly regain composure and fly to Atlanta for a work conference within the same week. In her hotel she fell very ill with a personal medical complication. Something was wrong with her vagina. There was heavy bleeding and a lot of pain.

146. When she returned home, she called the local mental health crisis breaking down to report she had been raped. Crisis said they would immediately start services, but after intake, waitlisted Ms. Mary for 3 months which was not acceptable to her.

147. On or around this time, Mary discovered Eric Horval had installed an iPhone location tracker and it was actively sending her location to him without her knowledge. She immediately turned it off.

148. Mary became overwhelmed. She was frightened of Eric. Of his family. She felt staying in her home was unsafe, but was bound to her obligations and was unable to afford to move to Maryland, and her career bound her to Ohio.

## XXIV. Mary Seeks Treatment for Rape

149. October 6th 2021, Mary met with Cleveland Clinic Behavioral Health in Akron. She was immediately diagnosed with PTSD, but they said they did not treat her condition. Ashley worked diligently to find an appropriate referral with Laura Hoffstetter who ended up referring her to Tina Kenny a few weeks later. Mary sought treatment within the first 3 months with 5 different facilities who all did not treat her diagnosis or had no openings.

150. By October 7th, 2021 Mary had fallen so medically ill she went into the Cleveland Clinic Medina ER. Her vagina was swollen and red, there was pain in her lower back. She felt short of breath and light headed. The medical doctor refused to give her an OGBYN exam. Mary broke down crying,

unable to cope with the constant dismissals.

151.    She told the nurse about the sexual assault. How her symptoms had worsened and she had been trying to treat them at home because she was scared. The doctor called the same Medina mental health clinic. They acknowledged Mary had called in July and she was on a waiting list, but their notes only blame Mary. Everyone remained dismissive and refused to treat her. Mary was instead given a referral to an OBGYN, who did not have any appointments until early December.

152.    December 8th 2021 Southwest General OBGYN discovered a lodged tampon in her body, that had been there for months. Mary broke down crying and again unable to cope with what was going on or neglect she had been experiencing.

153.    At that point Mary had connected with Tina Kenny a few weeks prior to begin EMDR treatment for PTSD. This medical discovery made Mary very ill. She could no longer function at her job effectively. Tina requested ADA accommodations for Mary due to her rapidly declining mental and physical state.

154.    Mary's PCP also officially diagnosed Mary with PTSD at this time.

155.    Mary's weight dropped to 103 lbs. She stopped eating and was unable to sleep.

156.    She feared Eric and his family were still stalking her and could no longer perform genuinely.

157.    Mary fled her job and home to Maryland in February 2022 out of fear. She spoke out

158.    February 26th, 2022 while in Manhattan for work and filed a police report against Eric Horval for the abuses she was suffering. Mary was on the brink of collapse.

---

## XXV. Abuse of Police Process and False Report March 2nd, 2022

159.    Beginning in or about 2018 Eric engaged in a pattern of filing police reports and supplemental narratives that materially mischaracterized events and falsely accused Plaintiff of wrongdoing, with the deliberate intent of creating a formal record he could later present as "proof" and control Mary from speaking out.

160.     On March 2nd, 2022 approximately seven months after Mary permanently separated

from Eric ceased all contact and within days of filing a police report for rape against him, Eric again contacted

law enforcement and lodged a new report to again implicate Mary in illegal activity. Officer Denton

states the following:

> *"Met with Eric who advised his ex-girlfriend broke communication silence on Saturday and posted a You Tube video that was defaming to him and his companies, Eric stated that she has not contacted him directly and has made no threats. He advised he wanted it documented that she is not in the right place due to her losing her job, her mental health and defaming him by making allegations. He was advised to keep his house secure and if she showed up for any reason to contact us and not make contact with her. Nothing further."*

161.     A true and correct copy of Eric Horval's March 2nd, 2022 Police Report is annexed hereto as

**EXHIBIT 19**

162.     Note that by Eric Horval's own admission to police he had continued to keep surveillance on Ms.

Mary up to and after he assaulted her. Over multiple years Eric intentionally cultivated, exaggerated, and in

some instances fabricated official reports, documents, photographs and narratives into a coherent instrument —

the "file" — (as quoted by Justin Horval in his You Tube videos) which he repeatedly threatened to publish,

while they were in an intimate relationship.

163.     This "file" was not a neutral collection: it was a weapon Eric built to intimidate, silence and

control Mary and to serve as the basis for public defamation when convenient for the Defendants.

164.     This pattern of behavior is exemplified in the police report filed the following month, April 2022

by Eric Horval. In this report it appears he stole $130,000 from a woman he met on a dating web-site and

attempted to file a police report "for his accountant" accusing her of fraud. Officer Eckstine states the

following:                                                                                      Exhibit 20

> *"I met with the complainant, Eric Horval, at the Montville Police Department on April 16th, 2022, as he wanted to file a fraud report. He met a female on a dating website and they had a common interest in Cryptocurrency. She fronted him $130k and he invested $175k into Solium. His investment has grown, and Solium will not release his money until he pays taxes totaling $225k. Horval feels he is being scammed and his accountant advised him to obtain a police report so he can claim this as a financial loss on his taxes. Eric requested to type a statement at home and then drop it off when completed.*
>
> *"Mr. Horval has not returned with the statement as of April 6th, 2022. After speaking*

29

*with others about the case, its not clear at this point if there was fraudulent activity. Mr. Horval stated his investment is still there, but he cannot withdraw it without paying tax. Solium requires the tax to be paid with actual money, not shares from his stock."*

*"The case will be closed at this time, but will be re-opened if Mr. Horval return with further information."*

165.    A true and correct copy of Eric Horval's April 16th, 2022 Police Report is annexed hereto as

**EXHIBIT 20**

166.    These examples are illustrative of Eric's persistent pattern of using law enforcement as an instrument to build publishable records intended to intimidate and lend false credibility to him and his conspirator's forthcoming public statements.

---

## XXVI. <u>March 2nd, 2022 Justin's 1st YouTube Publication –</u>

### *<u>"Wild and Slanderous — Hells Headbangers accusations addressed with straight facts by J-Dawg"</u>*

167.    A true and correct copy of Justin Horval's March 2nd, 2022 YouTube video and corresponding transcript is annexed hereto as **EXHIBIT 3**

168.    Within hours of Eric's March 2, 2022 Montville police report, on March 2, 2022, Defendant Justin Horval, Eric's brother and business associate through Hells Headbangers Records and Shadow Kingdom Records, published a YouTube video entitled <u>*"Wild and Slanderous — Hells Headbangers accusations addressed with straight facts by J-Dawg".*</u> In this video, Justin repeated Eric's false narrative publicly and accused Plaintiff of dishonesty, misconduct, and malicious intent.

169.    Because of Justin's close familial relationship to Eric and his role in the Defendants shared business ventures, viewers were led to believe Justin had insider knowledge of the situation. His statements, presented as absolute facts rather than opinion, carried the false weight of credibility and authority.

170.    Among other things, Justin declared:

 i. *0:35 – "..and so I'm going to talk about it and let you guys know all the truth and that is uh so so for those of you guys that don't know uh Eric is uh my brother he owns the hells head bangers with me and Chase and um his ex-fiancé they broke up about approximately seven months ago.."*

30

ii. *1:04 – "I can tell you guys without a shadow of a doubt these are 100 false uh there's zero truth to it whatsoever and I'm not just saying that being biased because he's my brother um I know these I know this for 100 facts and not only do I know for a fact just knowing him all my life and"*

iii. *1:22 – "I've known her now for six years and she has definitely shown uh her character with uh multiple things she's been scandalous on other people that has known and provable and I'm not thinking you can and out so she's kind of known for doing this kind of [ __ ]"*

iv. *5:34 – "..it there's nothing to talk about like this 100 false lies she's making [ __ ] up she's just disgruntled she's pissed off and she's just trying to get back at him because he broke up with her.."*

v. *8:34 – "..no just currently what she put out there that is false that is 100 a [ __ ] lie there's no even like hey let's there's no 100 [ __ ] false I want to make that 100 clear I go to my grave saying that's.."*

vi. *7:52 – "she's just taking it to another level we've all dealt with you know that pissed off [ __ ] ex right that's all this is that's literally all it is if you read what she wrote you like that's [ __ ] crazy went that far right yeah exactly it sounds pretty [ __ ] low"*

vii. *7:05 – "..kind of things and uh and also she also has a track record history of um being disgruntled with uh past jobs Etc very well known facts I mean if you dig into are people that know they know this"*

171.     These statements are defamatory per se, as they directly accuse Plaintiff of dishonesty and fabricating abuse allegations, and present Justin's denial as objective fact. The video is even titled to give the viewer the impression they were getting the "facts" of the allegations through Justin's direct life-long connection to his brother and Mary whom he claimed to have known six years.

172.     Justin further bolstered Eric's false narrative by asserting that Eric had compiled a damaging "file" of evidence against Mary, stating:

viii. *5:54 – "he has photographs of I'm not going to get into what but actual physical photographs of uh abuse from her he has uh recordings and he has uh he's called the police multiple times.."*

173.     This statement actually reinforces Mary's allegations she was under duress for the entirety of their relationship, being threatened by Eric Horval with false allegations and public exposure, which the Defendant's sought to incite public contempt in right thinking persons.

31

174. These statements are false, defamatory, and damaging to Plaintiff's personal and professional reputation.

---

## XXVII. March 4, 2022: Justin's 2nd YouTube Video Publication –

### *"SLOPPY HIT JOB on Hells Headbangers destroyed by ARREST REPORT of Unwell Accuser!"*

175. A true and correct copy of Justin Horval's March 4th, 2022 YouTube video and corresponding transcript is annexed hereto as **EXHIBIT 4**

176. On March 4, 2022, Justin doubled down on his campaign by publishing a second video titled *"SLOPPY HIT JOB on Hells Headbangers destroyed by ARREST REPORT of Unwell Accuser!"* in which he escalated the campaign and further repeating these same falsehoods and amplifying them further to his online audience, reinforcing the defamatory narrative in coordination with Eric to distract from the allegations and fuel unjust enrichment of the situation by controlling the narrative publicly.

177. Justin introduced the video by declaring:

> i. *1:35 – "what first did is as I I broke down the uh the accusation of the letter I printed out and I went through it uh one by one with eric and so in his words he kind of describes it's okay i was gonna read off certain clips um and you tell me what what [ __ ] happened and basically, I just typed it up right then and there or a little bit just to kind of just you know put in my own words that i am going to read off so I'm going to read off her statement first and I'm going to read off what he had to say and what's what happened."*

178. This admission demonstrates that Justin was not acting independently but was directly publishing Eric's version of events to the public and liable for all statements made.

179. Justin then relayed Eric's narrative to his YouTube audience, asserting:

> ii. *6:34 – "...and in case any of the [ __ ] devils out there a little out of the loop like I didn't actually see uh what she accused well now you're [ __ ] hearing it and uh this just proves like you like you didn't know you didn't go to a [ __ ] hospital facts..."*

> iii. *2:04 - "I told you we have stacks of evidence which we do and if I have to bust it out one in a time then I will but uh this should be a goddamn slam dunk"*

> iv. *2:28 - "...but here what the first piece of evidence I have brought up I have the uh Medina Police Department's uh arrest report"*

32

v. *5:32 – "...uh all the details of that day and the attachment police report to back up everything eric is claiming like I said got it you're gonna hear it you wanna know what's not in the police report the day after she was raped.."*

vi. *3:56 – "I'm sure all you guys are read by now or maybe not and uh give you what uh eric had to say and then after that we're gonna follow it up with the [ __ ] police report so yeah I'll try to read fast guys there's a lot to say and the police report is four [ __ ] pages so uh get your goddamn [ __ ] uh popcorn and enjoy the [ __ ] show if nothing else so here the [ __ ] we go.."*

vii. *32:53 – "..again and then he's also got uh so another rich police report photos for sure and he's got tons of audio recordings and again he's like a lot of us.."*

viii. *21:22 – "..I mean like what the [ __ ] are you doing like guys this is literally the irrational type of human being we're dealing this is [ __ ] crazy can't make this [ __ ] up.."*

ix. *26:56 "..she's doing just because she's [ __ ] pissed off just talking [ __ ] didn't say this seven months ago Mary and then uh she was in the midst of a manic episode.."*

x. *34:24 .."...just proving that she's just a 100 [ __ ] liar because she's just disgruntled and just that's just how she does things in life I guess I was willing to sink that low be that low of a person.."*

xi. *33:06 – "I've got her saying all kinds of crap like uh it's like it's just us talking it's like it's clearly like you can see that yeah no mention of rapes nothing and just how [ __ ] psycho she was.."*

xii. *11:39 – "..why the [ __ ] are you making [ __ ] that you 100 for a fact no is false 100 for a fact she knows is false.."*

xiii. *12:34 – "..get your corn guys because it's a goodie so like i said the arrestee Mary Mary Amber.."*

xiv. *20:32 "..why he told the officer yeah that's what she does she [ __ ] attacks me and [ __ ] go psycho on my ass.."*

180. These statements were false and defamatory. They accused Plaintiff of fabricating sexual assault allegations, labeled her as mentally ill and unstable, falsely portrayed her as violent and abusive, and attacked her integrity and reputation. What unfolded was the year's long threats for seeking accountability for abuse.

181. Note – These videos were published while there was an active criminal investigation ongoing.

182. Importantly, despite Defendants' repeated claims in these videos and publications, Plaintiff has never pled to any of the criminal claims made. This fact underscores that Defendants' accusations were not

33

grounded in law enforcement or judicial findings but were malicious fabrications published to destroy Plaintiff's reputation. The defendants use Law Enforcement to file false police reports to threaten women into abuse relationships through blackmail.

183.     The March 4, 2022 *"Sloppy Hit Job"* video, together with Justin's March 2, 2022 *"Wild and Slanderous"* video and Eric's contemporaneous police filing, were part of a coordinated campaign of defamation and reputational destruction, carried out jointly by Eric and Justin to silence Mary, hurt her financially, protect their personal and business interests and exploit Mary's suffering, for profit.

## XXVIII. <u>March 4, 2022: MetalSucks.net publishes an article in coordination with the Defendants –</u>

### <u>*"Hells Headbangers Co-Owner Eric Horval Accused of Rape and Abuse, Brother and Co-Owner Justin Horval Says, "There's Zero Truth To It Whatsoever"*</u>

184.     A true and correct copy of MetalSucks.net's March 4th, 2022 published article found through public records is annexed hereto as **EXHIBIT 21**

185.     Almost immediately, these defamatory statements were picked up and amplified by MetalSucks.net, a widely read online publication in the heavy metal music community which has previously exposed the Defendant's as having ties to Nazi organizations.

186.     March 4, 2022, MetalSucks.com had republished the Defendants' false narrative, embedding

187.     their videos, spreading the lies to an even broader audience within their "extreme" music community, amplifying Justin's videos, embedding them within the article and providing a platform for further public comment and harassment compounding the harm to Mary's reputation and which remains online to this day.

## XXIX. <u>March 2022 - "Eazy E" Comment made by Defendants within the MetalSucks.net published Article</u>

188. A true and correct copy of MetalSucks.net's March 15th, 2022 published comment by "Easy E' found through public records is annexed hereto as **EXHIBIT 22**

189. This set off an active comments thread in which Defendants' supporters and agents repeated and amplified the defamatory narrative Eric and Justin fabricated through unverified / anonymous accounts.

190. Among the most damning comments posted in that thread was a comment under the alias "Eazy E" (a moniker used publicly by Eric Horval) which stated:

> z. *"HHR did another video and shared police reports. She was arrested…where is the update?"*

191. That comment — posted under a handle associated with Eric — evidences the precise mechanism by which Defendants converted unsubstituted, distorted police filings into an online campaign of intimidation and calls for ongoing exposure.

192. The *MetalSucks.net* comments thread continued to be a venue for harassment through 2022, 2023 and into 2024, amplifying false narratives and inspiring followers to continue retaliatory conduct long after the article was archived and not on the website's landing page. That shows the commentor's were actively seeking out this article to keep Mary's name amplified and associated with these baseless claims through online searches. A type of cyber-doxxing to ruin one's career and reputation.

---

## XXX. <u>A Conspired and Coordinated Smear Campaign</u>

193. This sequence — Eric's March 2 police filing, Justin's March 2 and March 4 YouTube publications, and the March 4 MetalSucks.com amplification — demonstrates a coordinated campaign of defamation, harassment, and reputational destruction, designed to silence Mary, protect Eric, and enrich the Defendants' business interests unjustly.

194. These two March 2 and March 4 videos were published in direct temporal relation to Eric's March 2 Montville police call and functioned to broadcast Eric's constructed narrative to the Defendants' substantially large online audience, thereby converting private police filings into a public weapon.

195. These false reports were further amplified by Eric in the comment section of the Metal Sucks

35

article.

---

## XXXI. March 22, 2022 JOABA Podcast – Even Further Amplification by Defendants

196.   A true and correct copy of JOABA Podcast Episode 37 on March 22nd, 2022 published on YouTube and found through public records is annexed hereto as **EXHIBIT 23**

197.   On March 22, 2022, following the denial of the Maryland protection order (and as part of the same campaign of public exposure), Justin appeared on the JOABA podcast and repeated and expanded the defamatory narrative with verbatim statements including:

f.   *"...even getting so not like anybody because it's funny because anyone that that doesn't understand that situation that believes her is number one you're, you're a [ __ ] idiot I don't know how you get by in life because like who hasn't had it or at least known somebody with a crazy ex-girlfriend like anyone could say anything like literally dude she has no proof of nothing and she's like if you met her you would be like oh this chick's [ __ ] crazy like she's just straight up is and we actually he actually has evidence and..."*

g.   *"..like I don't know dude that seemed [ __ ] fishy no Eric was he was never arrested there was no there was no rape kit there was no evidence there was no accused of it there was no go to court there was nothing it's seven months later she's just making [ __ ] up because she's [ __ ] pissed off at him still"*

h.   *"...and it's funny because if anyone ever met her dude this chick is basically his size like eric's a [ __ ] pipsqueak you know what i mean he didn't [ __ ] pin some girl down and [ __ ] rape her like it's just ridiculous and not nor would he [ __ ] do that and it's like it's absolutely asinine and anyone that knows this [ __ ] chick knows she's like dude there's something wrong upstairs like i knew that way before uh any of this went down as a matter of fact even chase told him like maybe one year in the relationship they were at their house or whatever and he that he heard her talk and shut down and she was just talking [ __ ] he told eric dude you better get rid of that girl I'm telling you right now she's I'll, I'm not gonna say a name she's Betsy number two there's another chick in the past that was crazy I'm telling I'm calling it right now I'm telling you this [ __ ] is bad news he called this like four years Ago and he's a hundred percent and I I saw too I'm like dude there's something about now i didn't think she would go do something like that but like yeah this chick you could just tell she's just no good like you just you could just [ __ ] tell and there's multiple other people that matter in person like...."*

198.   These statements made by Justin Horval on the JOABA podcast were broadcast to a wide audience within the state of New York and preserved online. They are false, made with actual malice or reckless disregard for the truth, and constitute defamation per se because they impute criminal and misconduct and

36

professional dishonesty to Plaintiff.

199.    If the viewers and host were aware of the Marh 2nd, 2022 police report filed by Eric Horval the days prior, it would have clearly shown Eric was the one stalking Mary. Justin was levering his connections with the media to defame Mary while enriching himself through her very public reputational demise they inflicted.

---

## XXXII. Third-Party Amplification, Followers, and Business Partners

200.    Defendants' campaign was not limited to their own channels of distribution. They relied on a network of third-party promoters, business partners, and followers to magnify the false narrative and fuel incitement of real-world ostracism and intimidation within her personal life and career.

201.    Defendants' business partners and label relationships including but not limited to Werewolf Records, Redrum Records and other associates in the extreme underground metal scene repeatedly engaged with the defamatory material and / or harassed or threatened Mary directly thereby also inciting their specific fanbase of followers to target Mary in-person and online, expanding the harm caused exponentially.

202.    In particular, a known business partner and associate of the Defendant's, Lauri Pentillä / "Lauri Pentilla" also known as, "Graf. Wolf" etc., who aligns and is known to be a Neo-Nazi musician replied to a Facebook comment, where MetalSucks.net had re-posted the published article, stating:

> i. *"She should be murdered."*

203.    This comment garnered nearly 17 "likes" which identified these people agreed with the statement. Mary interpreted this as a direct threat on her life by a man with a large following of violent, mentally-ill extremists who do business with the Defendants and are publicly and directly aligned.

204.    Mary also has been targeted by individuals and accounts in broader online communities apart from music, who, after the allegations were publicized, harassed Mary attempting parrot the same

messages as the Defendants. Plaintiff alleges and will show through preserved archives and screenshots that users and influencers in a broad spectrum of backgrounds and lifestyles, targeted, harassed and reiterated unsubstantiated claims the Defendant's made. A true and correct copy of comments made on Ms. Mary's private online profiles is annexed hereto as **EXHIBIT 24**

205.    At a certain point a family member of a Senator in Michigan was stalking Mary online, whom their daughter, Amber Barcenas, was known to be "friends" with the Defendants and whom was also stalking Mary in Mexico, relaying her location to the Defendants. A true and correct copy of screenshots of Abigail Barcenas-Bergman attempting to gain access to Mary's private profile, who is the daughter in law to Michigan Senator Bergman and also the mother of Amber Bercenas. public records is annexed hereto as **EXHIBIT 25**

206.    The activity of such third parties — acting in the wake of Defendants' publications demonstrates the foreseeable and actual translation of online defamation into real-world, life-altering consequences. Defendants' publications and their reliance on Eric's false police reports to justify and publicize false narratives were intended to, and did, incite targeted harassment of Plaintiff by followers, associates, business partners and political allies who sought to align with the Defendants and the ideologies to influence their voting fanbase.

207.    Plaintiff received repeated harassing communications, threats, doxxing attempts, and offline stalking incidents traceable to followers and contacts within Defendants' direct community and geography.

---

**XXXIII. Further Exploitation and Distribution of Mary's likeness for the Defendants profit**

208.    Beyond the Midnight album back cover, Beginning May 2022 Eric, in his capacity as a digital graphic designer and photographer, created and published sexually explicit and derogatory digital t-shirt mock-ups using an image of Mary that were sold and / or displayed through Defendants' labels and online stores, available for purchase in New York.

209.    Beginning May 2022 and continuing on through June 2024 the Defendants started releasing digitally mocked-up photos of Mary in the blank shirt Eric shot of her from years' prior. They used her

38

image to unjustly enrich themselves through exploitation of her body.

210.    The first shirt released and sold was in conspiracy with a band named, Nunslaughter, titled "Rotten Cunt" and depicts an image of the corpse of a nun, naked and flayed, with a snake slithering out of her vagina. They went onto release a second shirt titled "The Bog People" and depicts an image of a corpse swinging from a noose over a bog. A true and correct copy of screen shots of the Hells Headbangers.com website promoting digitally mocked-up images of Mary and the corresponding images proving the images is Mary herself is annexed hereto as **EXHIBIT 26**. A true and correct copy of screen shots of the Hells Headbangers.com website promoting digitally mocked-up images of Mary is annexed hereto as **EXHIBIT 27**

211.    The third shirt released and sold between May 2022 and June 2024 was in conspiracy with a band named Profantica and titled, "Desecrated" and depicts an image of 3 nuns, which Mary interprets this as being the 3 Hells Headbangers owners, Eric, Justin and Chase Horval or the "women" they have moved onto standing behind the phrase. A true and correct copy of screen shots of the Hells Headbangers.com website promoting digitally mocked-up images of Mary is annexed hereto as **EXHIBIT 28**

212.    The Forth shirt released and sold between May 2022 and June 2024 is titled, "Witchtrap: Evil Strikes Again." Whom Eric Horval is seen later with the band member, standing over an effigy of what appears to be a mannequin dressed in the same identical clothing as Eric, but his alter ego. The devil. A true and correct copy of screen shots of the Hells Headbangers.com website promoting digitally mocked-up images of Ms. Mary is annexed hereto as **Exhibit 30**. A true and correct copy of the WitchTrap Instagram webpage showing Eric Horval using Mary's jacket on an effigy is annexed hereto as **EXHIBIT 31**.

213.    These intentional acts were curated and targeted directly towards Mary by the defendants and through their powerful influence in this music space.

214.    Her body and her identity were further exploited, violated and used to intentionally inflict psychological and emotional damage upon her.

215.     These images were also used to further fuel the humiliation and online attacks she faced by and through the influence of their fane-base and the fan bases of all the bands who were outwardly conspiring with them to exploit this abuse to enrich themselves unjustly. These t-shirts were sold on their business' websites to the humiliation of Mary until June 20th 2024 when Kings Family Court Intervened.

## XXXIV. Defendants Continue a Pattern of Exploitation in Medina County, OH

216.     The Defendants, through prolong exploitation and abuse of Mary from 2015 through 2024 unjustly enriched themselves, expanding their warehouse space by 4 times the square footage in Medina County, OH. Broadening their distribution and partnerships of white nationalist music and the deceptive marketing funnel they have created.

217.     They gained notoriety within the white supremist spaces, locally in Medina, OH, particularly city and federal prosecutors, who now have been shielding them from any accountability.   These prosecutors went onto harass Mary with threats and false accusations, none which lead to any charges.

218.     Residents 6 houses away began stalking Mary online, calling her a "whore" and a bad mother. She stopped going outside. A true and correct copy of screen shots of Medina, OH resident, Shana Gant, who resides at approximately 367 Brookland Drive, Medina OH 44256 annexed hereto as **EXHIBIT 32**

## XXXV. Defendants Physically Stalk and Threaten Mary

219.     Anonymous profiles began commenting on Mary's social media pages, slandering, Attacking, doxxing her name on third-party websites almost immediately after Justin's videos were published.

220.     After the devastating court dismissals, Mary attempted to move forward with her life. She was working for Classic of New York, in Brooklyn NY; trying to get her life back on track.

## XXXVI. Eric Horval Follows Mary into Parking Lot

40

221.     August 10th 2022 a friend came to town on tour who invited Mary to their show in Cleveland. Eric Horval, Justin Horval, his wife and Chase Horval were all there. When Mary attempted to walk outside alone, Eric Horval followed her to her car. She quickly ran back inside the venue.

## XXXVII. Defendants and Family Follow Mary and Threaten Her

222.     August 30th 2022 Mary attended another concert at the Odeon Theatre in Cleveland. Eric Horval, Justin Horval, Chase Horval, Lindsey Horval, Jaime Walters were all there. In the restroom, Lindsey Horval verbally attacked Mary. She told her, "Bitch get the fuck out of here, what the fuck are you doing here anyway, cunt."

## XXXVIII. Harm to Mary's Professional Opportunities in New York

223.     Defendants' publications circulated in the music and fashion communities in New York.

224.     On September 8, 2022, New York musician Will Rahmer (Mortician; Yonkers, NY) communicated to Mary that he would not work with her because of the lawsuits and allegations being publicly circulated about her, stating in substance:

> j.     *"YOU DIDN'T TELL ME HOW DEEP THIS SHIT WAS IF I KNOW I WOULDNT HAVE EVEN BORHERED WITH THE LIST WTF REALLY? Hey Will, this is all fine with the exception of Mary Mary -- she currently has lawsuits against her ex Eric from Hells Headbangers, and another one against the band Nunslaughter, all of whom will be attending the fest. I think it would be more drama than it's worth if she were to show up. Feel free to throw me under the bus about this..I just can't have her here stirring any pots. Everyone else is all set! -Em\"*

225.     That communication shows direct harm to Mary's professional prospects in New York.

226.     Defendants also sponsored and promoted events in New York (for example, TV Eye in Queens bearing Shadow Kingdom branding) and engaged with New York-based performers and partners. Those activities evidence purposeful availment of the New York market and the foreseeability of harm in New York.

**XXXIX. Mary Attempts to File a Protective Order for Herself in Medina Against Eric Horval**

227.     Mary filed her 1st Order of Protection in Medina against Eric Horval. She was petrified of what the Defendants would do next. The Defendants used their power and influence in the extreme music scene to incite harassment against Mary. And it was working well. The government took notice and the Defendants began a series of tours in Michigan, Indiana and Pennsylvania – using their benign label fronts to expose and sell violent, political, fascist music to their fan-base, turning now their focus to promoting their fan-base to vote in-line with the cruelty and violence Donald Trump was promising to inflict on the disabled and minorities.

228.     The case was set for Nov 3rd, 2022. The decision was not released for nearly 6 weeks.

229.     November 16th 2022 Mary attended a concert at the Westside Bowl. She was gang-stalked and threatened with assault if she didn't leave by the Defendants, their wives and their friends.

230.     Mary filed a police report who saw the video surveillance. They noted that Ms. Mary was being "intimidated" but offered her no protection.

**XXXX. Mary is under surveillance in Mexico by "friends" of the Defendants**

231.     December 3rd, 2022 Mary traveled to Mexico to get away from what was happening.

232.     Mary discovered around April 2023 the Horval family knew she had traveled to Mexico. This frightened Mary due to her property being situated less than 10 miles from Justin, Eric and their warehouse. She feared her house would be attacked while she was traveling.

**XXXXI. Mary attempts to file a collective protection order against: Justin Horval, Lindsey Horval, Emma Jochum and Amber Winter**

233.     In one final desperate action, Mary filed protection orders against Justin Horval, Lindsey Horval, Amber Winter and Emma Jochum. The court dismissed all claims. Mary is unable to

42

cope.

## XXXXII. Mary decides not to return to her Ohio property seeking help in New York

234.   Mary made a plan October 2023 never to return due to safety issues within the state but nothing changed.

235.   It was discovered around April 2024 Eric Horval had in-fact been paying these people to hurt Mary's reputation.

## XXXXIII. Mary Obtains a Temporary Protection Order w/ Address Confidentiality in New York

236.   On June 20, 2024 Plaintiff obtained a temporary protection order from Kings County Family Court (File No. 327053) based on the sustained harassment and abusive conduct she had endured.

237.   Immediately all the videos, and images of Mary were taken down although the Metalsucks.net article is still published on their website and third-party websites. Exhibits 9 and 10

## XXXXIV. New York Family Court Proceedings; July 18, 2024 Hearing

238.   At a hearing on July 18, 2024 in Kings County Family Court, court personnel observed Defendant Eric attempting to record Court proceedings — the attempted recording was visible in the reflection of his eyeglasses — in violation of court rules. The Court condemned the conduct, barred recording, and entered restrictions on further public social-media posts regarding Plaintiff.

239.   The attempted recording and prior public threats demonstrate Defendants' continuing intent to exploit court proceedings as part of their public harassment strategy.

          This again re-traumatized Mary and prolonged her recovery significantly. Exhibit 11

**XXXXV.** **Mary is permanently disabled with PTSD and OCD due to Defendants Actions.**

240. May 2023 Mary's therapist recommended she apply for social security disability. She advised that the therapy would not be effective if she still in danger. She recommended Mary consider leaving her home to seek safety. Mary could no longer function, she was having repeated flashbacks, nightmares and was living in constant fear of another attack by the Defendants or the people they influenced to hurt Mary.

241. August 17th 2023 Only 3 months after Mary's application was submitted, Social Security approves her as having a permanent PTSD and OCD. She had been admitted and diagnosed by this time by multiple different hospitals in Ohio and Maryland. A true and correct copy of the Social Security Administration's August 17th 2023 determination is annexed hereto as **EXHIBIT 33**

242. Mary is informed October 2023 and makes plans to seek treatment in New York.

243. Mary begins Treatment with Woodhull Hospital May 2024 in Brooklyn, NYC.

244. September 24th, 2024 Dr Kato at Woodhull Hospital does not recommend Mary return to her property in Ohio and stay in New York. She provided a letter that states:

> *"To whom it may concern,*
>
> *This letter is to verify that Ms. "Mary Moe" (DOB: 4/23/1981) has been receiving mental health treatment at Woodhull Medical Center Adult Outpatient Psychiatry Department since 8/30/2024. Due to her current emotional status and safety concerns, it is recommended that Mary is unable to travel at this time as she should continue and focus on her treatment."*

245. A true and correct copy of Doctor Kato's signed letter is annexed hereto as **EXHIBIT 34**
246.
247. December 2024 – Mary is again Diagnosed with PTSD. This time with a New York State Hospital, Woodhull. They were only able diagnose Mary but offered no continuation of treatment she was receiving with Tina Kenny. They advised EMDR was a private pay or PPO insurance

qualified treatment only, which Mary had at the onset of her diagnosis and which worked for her. A true and correct copy of Doctor Maria Roa's psychological evaluation December 2024 is annexed hereto as

**EXHIBIT 35**

---

## XXXXVI. <u>Political Targeting, Property Foreclosure Attempts, and Ohio Litigation</u>

248.    Beginning 2022 and into 2025 Mary been targeted by political subdivisions and local officials in Medina County, Ohio in ways that appear coordinated with or emboldened by Defendants' public campaign. Plaintiff pleads that local actors engaged in conduct including falsification of official records, abuse of discretion in administrative or court processes, and other misuse of governmental authority toward unlawfully depriving Plaintiff of her property or otherwise violating her civil rights. A true and correct copy of Mary's complaint and the Political subdivision's attempt to subvert the crime is annexed hereto as

**EXHIBIT 36**

249.    Those municipal and quasi-governmental acts include efforts to foreclose on or otherwise encumber Plaintiff's Medina County property on defective or falsified bases. Plaintiff has commenced litigation in the Ohio Court of Claims against Medina County for abuse of process, falsification of records, and defamation based on those actions and their connection to Defendants' campaign.

---

## XXXXVII. <u>Eric Horval and The Defendants Physical, Sexual, Psychological and Emotional Abuse against Mary Has Caused her life-long harm</u>

250.    The combined effect of private and public misconduct — Defendants' online defamation; third-party violent rhetoric; and political subdivision misconduct — has been sustained and severe. She has suffered and continues to suffer from severe emotional and psychological distress.

251.    Due to these factors, Mary is unable to regain any assemblance of her former life or career. She is inflicted with daily flashbacks, nightmares, cognitive delays, memory loss, and extreme

avoidance and fear of all people and places.

252.    She is seeking a confidential name change that is pending Kings Family Court's decision.

253.    Mary is currently a participant of the New York State Department of Adult Education Rehabilitation Division, trying desperately to move forward with her life, while in hiding.

254.    The years long threats of "exposure" Mary had to endure and the preceding follow through on those threats continue to permeate all of her relationships both personal and professional and how she interacts with the world around her overall.

255.    She lives in constant fear of all people unable to form genuine trusting relationships. Ms. Mary is unable to maintain any focus without the intrusive horrific memories constantly flooding her consciousness.

256.    Mary will require years of intensive outpatient EMDR treatment and therapy to recover from the Defendants actions. Thanks to the passage of the New York's Adult Survivors' Act and King County Family court Mary has been able to regain enough breathing room to confront these prolonged and collective abuses inflicted and tolled against her to hold Eric Horval and those who enabled his abuse to be held accountable for their actions.

---

**XXXXVIII. Defendant's Going Threats to Mary due to Ongoing Illegal Activity.**

257.    The Defendants intentional, defamatory, ongoing abusive and tortious invasion or Ms. Mary's right to privacy stem from her knowledge of their illegal personal and business activity.

258.    They Defendants are sponsoring the illegal entry of White Nationalists from Finland through New York Customs Border and were caught in April 2022. Their objective is to rally their fan-base to enact individual acts of violence and gang-stalking against the disabled and women, facilitated and communicated under the guise of "music". It worked perfectly against Mary, and how they wield this onslaught against anyone they hate.

259.    The public has already seen this uprising throughout 2023 and 2024 and it is due in

part to the defendants Nazi propaganda lobbying. They are being politically protected by Medina County, OH government to accomplish this. Exhibits 6, 7

---

## XXXXIX. <u>Medical, Economic and Reputational Harm; Continuing Injury</u>

260.   As a direct and proximate result of Defendants' conduct Plaintiff has suffered severe emotional distress and mental-health consequences, including a diagnosis of Post-Traumatic Stress Disorder (PTSD), anxiety, depression, and related physical symptoms.

261.   Plaintiff has lost business opportunities and income in the fashion and music industries, including cancelled bookings, terminated collaborations and lost contracts attributable to Defendants' defamatory publications and efforts to discredit her professionally.

262.   Plaintiff has been forced to enroll in address-confidentiality programs, restrict her public presence, and consider legal name-change measures for safety.

263.   Defendants unjustly profited from the notoriety and attention their campaign generated — in the form of merchandise sales, record sales, advertising/monetization of videos and heightened publicity for their labels and associated business interests — at Plaintiff's expense.

264.   Plaintiff continues to suffer reputational, emotional and financial injury as a direct and proximate consequence of Defendants' acts.

---

## XXXXX. <u>Evidence, Reservation and Ratification</u>

265.   Plaintiff reserves the right to identify additional documents, recordings, social media accounts, aliases, subsidiaries, partners and actors as discovery proceeds, and to amend the pleadings accordingly.

266.   All acts alleged above were committed by Defendants, or by their agents, servants, employees, co-conspirators and other persons acting in concert with them, each acting within the scope of such agency, employment, or conspiracy and with the knowledge, approval and ratification of the others.

267.    As a direct and proximate result of the foregoing, Plaintiff has been injured and seeks relief as alleged in the causes of action that follow.

---

## XXXXXI. Damages

268.    Plaintiff has suffered:

- Severe emotional distress and PTSD;
- Damage to reputation and career;
- Loss of income and professional opportunities;
- Medical and therapy costs;
- Threats and loss of safety for herself and her family.

269.    Plaintiff seeks compensatory damages, punitive damages, statutory damages, and injunctive Relief in the amount of $10,000,000 (ten-million) Dollars or as this court deems just and appropriate.

---

### FIRST CAUSE OF ACTION
### Defamation Per Se
*Against All Defendants*

270.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

### A. Defendants Published False Statements of Fact

271.    On March 2 and March 4, 2022, Defendants, acting jointly and in concert, published and disseminated created, produced, and participated in three YouTube videos, including but not limited to:
(1) *Wild and Slanderous — Hells Headbangers accusations addressed with straight facts by J-Dawg"* (March 2, 2022), and
(2) *"SLOPPY HIT JOB on Hells Headbangers destroyed by ARREST REPORT of Unwell Accuser!"* (March 4, 2022).

272.    The videos were published to Defendants' substantial public audience and the general public, in which they made multiple false statements about Plaintiff, presented as fact and derived from alleged "insider knowledge" of the Plaintiff.

273.    In these videos, Defendants made numerous statements of purported fact concerning Plaintiff that were false, defamatory, and asserted with the appearance of factual authority. These included, without limitation:

### Page 30-31 - Line 170
   i.   *0:35 – "..and so I'm going to talk about it and let you guys know all the truth and that is uh so so for those of you guys that don't know uh Eric is uh my brother he owns the*

48

*hells head bangers with me and Chase and um his ex-fiancé they broke up about approximately seven months ago.."*

ii. *1:04 – "I can tell you guys without a shadow of a doubt these are 100 false uh there's zero truth to it whatsoever and I'm not just saying that being biased because he's my brother um I know these I know this for 100 facts and not only do I know for a fact just knowing him all my life and"*

iii. *1:22 – "I've known her now for six years and she has definitely shown uh her character with uh multiple things she's been scandalous on other people that has known and provable and I'm not thinking you can and out so she's kind of known for doing this kind of [ __ ]"*

iv. *5:34 – "..it there's nothing to talk about like this 100 false lies she's making [ __ ] up she's just disgruntled she's pissed off and she's just trying to get back at him because he broke up with her.."*

v. *8:34 – "..no just currently what she put out there that is false that is 100 a [ __ ] lie there's no even like hey let's there's no 100 [ __ ] false I want to make that 100 clear I go to my grave saying that's.."*

vi. *7:52 – "she's just taking it to another level we've all dealt with you know that pissed off [ __ ] ex right that's all this is that's literally all it is if you read what she wrote you like that's [ __ ] crazy went that far right yeah exactly it sounds pretty [ __ ] low"*

vii. *7:05 – "..kind of things and uh and also she also has a track record history of um being disgruntled with uh past jobs Etc very well known facts I mean if you dig into are people that know they know this"*

**Page 32-33, Line 179**

i. *6:34 – "...and in case any of the [ __ ] devils out there a little out of the loop like I didn't actually see uh what she accused well now you're [ __ ] hearing it and uh this just proves like you like you didn't know you didn't go to a [ __ ] hospital facts..."*

ii. *2:04 - "I told you we have stacks of evidence which we do and if I have to bust it out one in a time then I will but uh this should be a goddamn slam dunk"*

iii. *2:28 - "...but here what the first piece of evidence I have brought up I have the uh Medina Police Department's uh arrest report"*

iv. *5:32 – "...uh all the details of that day and the attachment police report to back up everything eric is claiming like I said got it you're gonna hear it you wanna know what's not in the police report the day after she was raped.."*

v. *3:56 – "I'm sure all you guys are read by now or maybe not and uh give you what uh eric had to say and then after that we're gonna follow it up with the [ __ ] police report so yeah I'll try to read fast guys there's a lot to say and the police report is four [ __ ] pages so uh get your goddamn [ __ ] uh popcorn and enjoy the [ __ ] show if nothing else so here the [ __ ] we go.."*

49

vi.  *32:53 – "..again and then he's also got uh so another rich police report photos for sure and he's got tons of audio recordings and again he's like a lot of us.."*

vii.  *21:22 – "..I mean like what the [ __ ] are you doing like guys this is literally the irrational type of human being we're dealing this is [ __ ] crazy can't make this [ __ ] up.."*

viii.  *26:56 "..she's doing just because she's [ __ ] pissed off just talking [ __ ] didn't say this seven months ago Mary and then uh she was in the midst of a manic episode.."*

ix.  *34:24 .."...just proving that she's just a 100 [ __ ] liar because she's just disgruntled and just that's just how she does things in life I guess I was willing to sink that low be that low of a person.."*

x.  *33:06 – "I've got her saying all kinds of crap like uh it's like it's just us talking it's like it's clearly like you can see that yeah no mention of rapes nothing and just how [ __ ] psycho she was.."*

xi.  *11:39 – "..why the [ __ ] are you making [ __ ] that you 100 for a fact no is false 100 for a fact she knows is false.."*

xii.  *12:34 – "..get your corn guys because it's a goodie so like i said the arrestee Mary Mary Amber.."*

xiii.  *20:32 "..why he told the officer yeah that's what she does she [ __ ] attacks me and [ __ ] go psycho on my ass.."*

274.  Statements that Plaintiff "made everything up," "lies," or has a "track record of lying," conveyed as objective factual assertions rather than opinion;

275.  Statements that Plaintiff fabricated allegations of sexual assault and domestic abuse, presented as fact-based conclusions while the investigation was ongoing.

276.  Assertions that Plaintiff was "mentally unstable", "crazy," "unwell," implying invalidity to her claim on this basis, conveyed as fact and derived from Defendants' alleged, insider knowledge.

277.  Statements that Plaintiff was professionally dishonest, violent, or engaged in misconduct of moral turpitude;

278.  These statements are reflected in the transcripts attached as EXHIBIT 3 and EXHIBIT 23.

## B. Subsequent Defamatory Publications and Amplification

279.  On March 22, 2022, Defendant Justin Horval appeared on the JOABA Podcast (Episode 37), where he reiterated and expanded the defamatory narrative. Among the false statements made during this broadcast were:

## Page 36, Line 197

f. *"...even getting so not like anybody because it's funny because anyone that that doesn't understand that situation that believes her is number one you're, you're a [ __ ] idiot I don't know how you get by in life because like who hasn't had it or at least known*

50

*somebody with a crazy ex-girlfriend like anyone could say anything like literally dude she has no proof of nothing and she's like if you met her you would be like oh this chick's [ __ ] crazy like she's just straight up is and we actually he actually has evidence and…"*

g. *"..like I don't know dude that seemed [ __ ] fishy no Eric was he was never arrested there was no there was no rape kit there was no evidence there was no accused of it there was no go to court there was nothing it's seven months later she's just making [ __ ] up because she's [ __ ] pissed off at him still"*

h. *"…and it's funny because if anyone ever met her dude this chick is basically his size like eric's a [ __ ] pipsqueak you know what i mean he didn't [ __ ] pin some girl down and [ __ ] rape her like it's just ridiculous and not nor would he [ __ ] do that and it's like it's absolutely asinine and anyone that knows this [ __ ] chick knows she's like dude there's something wrong upstairs like i knew that way before uh any of this went down as a matter of fact even chase told him like maybe one year in the relationship they were at their house or whatever and he that he heard her talk and shut down and she was just talking [ __ ] he told eric dude you better get rid of that girl I'm telling you right now she's I'll, I'm not gonna say a name she's Betsy number two there's another chick in the past that was crazy I'm telling I'm calling it right now I'm telling you this [ __ ] is bad news he called this like four years Ago and he's a hundred percent and I I saw too I'm like dude there's something about now I didn't think she would go do something like that but like yeah this chick you could just tell she's just no good like you just you could just [ __ ] tell and there's multiple other people that matter in person like…."*

279. These statements were made with the appearance of first-hand knowledge and were disseminated to a substantial audience.

## C. Falsity Of Statements

280. All of the statements identified were false at the time they were made. Plaintiff did not fabricate any police reports or allegations, was not retaliating toward Defendants in any way. The Plaintiff spoke out once about the real abuse they were suffering. In response the Defendants leveraged their audience and media influence to incite years' long harassment towards the Plaintiff through dissemination of the Plaintiff's personal information to business associates and friends.

*281.* Each statement was asserted as a verifiable fact, not an opinion, as Defendants presented themselves as having personal knowledge of Plaintiff's character, relationships, history, and professional background AND as titled in the Defendants March 2nd You Tube video, "*"Wild and Slanderous — Hells Headbangers accusations <span style="color:red">addressed with straight facts</span> by J-Dawg"*

## D. Defendants Acted With Actual Malice

282. Defendants acted with actual malice because they knew the statements were false, fabricated their narrative to retaliate against Plaintiff for reporting abuse, and acted with reckless disregard for the truth. Evidence of actual malice includes:

a. The retaliatory timing: the publications occurred within hours of Plaintiff reporting sexual assault on February 26, 2022, and within hours of Eric's retaliatory police filing on March 2, 2022;

b. Defendants' acknowledgment that Justin's statements were based solely on Eric's narrative without independent verification;

c. Eric's multi-year creation of a curated "file," described in EXHIBIT 19 and EXHIBIT 20, intended to intimidate Plaintiff and to serve as a public weapon should Plaintiff report abuse;

d. The amplification of the narrative across multiple platforms in a coordinated fashion.

## E. Publication To Third Parties

283. The videos and podcast appearances were publicly available on YouTube and other platforms, accessible to tens of thousands of viewers. They were further republished in an article by MetalSucks.net on March 4, 2022, exponentially increasing their reach and ensuring widespread dissemination within the music and entertainment communities.

284. Defendants' supporters subsequently republished the statements through comments, online forums, and social media platforms, further amplifying the harm.

## F. The Statements Constitute Defamation Per Se

285. These statements constitute defamation per se because they:

a. Impugn Plaintiff's honesty, integrity, and character by falsely accusing her of fabricating crimes and reports to law enforcement;

b. Falsely assert that Plaintiff suffers from mental illness or instability;

c. Attribute criminal, fraudulent, violent, or abusive conduct to Plaintiff;

d. Are injurious to Plaintiff's profession in the fashion and music industries; and

e. Concern allegations of sexual conduct and morality, categories recognized as inherently defamatory.

286. Because the conduct constitutes defamation per se, Plaintiff is not required to plead or prove special damages.

## F. Damages

287. As a direct and proximate result of Defendants' actions, Plaintiff suffered:
a. Severe emotional and psychological harm, including PTSD;
b. Loss of professional opportunities, clients, and contractual engagements;
c. Damage to her personal and professional reputation;
d. Fear for her safety, requiring enrollment in address confidentiality programs;
e. Economic loss, humiliation, and ongoing reputational injury.

288. Plaintiff demands compensatory damages, special damages as proven at trial, punitive damages due to Defendants' malicious and reckless conduct, and such other relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### Howell v. New York Post Co., 81 N.Y.2d 115 (1993)
*Against All Defendants*

289. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

290.

## A. Defendants Engaged in a Multi-Year Pattern of Extreme, Outrageous, and Retaliatory Conduct

291.     As alleged throughout this Complaint, Defendants engaged in a prolonged, escalating, and coordinated campaign of coercion, violence, sexual exploitation, stalking, intimidation, defamation, and harassment designed to destroy Plaintiff's emotional stability, safety, livelihood, reputation, and dignity.

292.     Defendants' outrageous and intolerable conduct included, without limitation:

(a)     physical assaults against Plaintiff and Plaintiff's autistic son;

(b)     sexual violence and coerced sexual acts;

(c)     publication of a sexually explicit photograph of Plaintiff with her full legal name on a commercial album insert without consent;

(d)     installing tracking technology to monitor Plaintiff's movements;

(e)     fabricating or exaggerating police reports intended to silence and intimidate Plaintiff;

(f)     publishing defamatory YouTube videos intended to incite harassment and public contempt;

(g)     manipulating and weaponizing Plaintiff's private information, image, and reputation in retaliation for reporting abuse; and

(h)     coordinating with one another to publicly portray Plaintiff as dishonest, mentally unstable, and professionally untrustworthy.

## B. Outrageousness Beyond Any Bounds of Decency

293.     The conduct described above was extreme, outrageous, and utterly intolerable in a civilized society. Defendants' cumulative actions exceeded all reasonable bounds of decency and were calculated to inflict severe emotional and psychological harm on Plaintiff.

## C. Intent and Reckless Disregard

294.     Defendants engaged in this conduct intentionally, maliciously, and with the specific purpose of inflicting emotional harm, or, at minimum, with reckless disregard of the near-certain likelihood that Plaintiff would suffer severe emotional distress. Their retaliatory conduct escalated immediately after Plaintiff attempted to seek medical treatment, leave the abusive environment, or report the abuse to law enforcement.

295.     Defendants were fully aware of Plaintiff's vulnerabilities, including her role as sole caregiver to a disabled child, her limited familial support, her isolation, and the coercive dependency created through Defendants' emotional and financial manipulation. Defendants deliberately exploited these vulnerabilities to magnify the harm of their abuse and retaliation.

## D. Severe Emotional and Physical Harm

296.     As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, psychological trauma, humiliation, anxiety, hypervigilance, insomnia, depression, and symptoms consistent with Post-Traumatic Stress Disorder. Plaintiff was medically diagnosed with PTSD by multiple providers following the July 2021 sexual assault and subsequently as the abuse was ongoing until Kings Family Court intervened June 20th, 2024.

53

297.    Plaintiff also suffered physical manifestations of emotional distress, including significant weight loss, vomiting, panic episodes, medical complications requiring emergency care, and inability to work or function normally in daily life.

### E. Continued and Escalated Misconduct

298.    Defendants' misconduct continued after Plaintiff fled her property in Ohio, including publication of YouTube videos on March 2 and March 4, 2022, designed to publicly shame Plaintiff, discredit her reports of abuse, and incite Defendants' large online following to harass, threaten, and stalk Plaintiff. These publications foreseeably intensified Plaintiff's trauma and forced her into hiding, triggering the issuance of a New York Order of Protection and Address Confidentiality designation.

### F. Punitive Damages

299.    Defendants' conduct was willful, wanton, malicious, and in conscious disregard of Plaintiff's safety, psychological well-being, and dignity. Such conduct warrants the imposition of punitive damages to deter similar future misconduct.

### G. Damages

300.    Plaintiff accordingly seeks compensatory damages for emotional and psychological injuries, consequential damages, punitive damages, and such further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
### Publication of Sexually Explicit Images / Unauthorized Use of Likeness
### Civil Rights Law §§ 50–51
### Freihofer v. Hearst Corp., 65 N.Y.2d 135 (1985)
### *Against All Defendants*

301.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Defendants Used Plaintiff's Image, Likeness, and Body Without Written Consent for Commercial Purposes

302.    Defendants, acting individually and in concert, knowingly and intentionally used, reproduced, digitally altered, published, displayed, marketed, and commercially sold Plaintiff's image, likeness, body, and clothing for advertising and trade purposes without Plaintiff's written consent, in violation of N.Y. Civil Rights Law §§ 50–51.

303.    Defendants' unlawful conduct included two distinct forms of unauthorized image use:

1. The 2017 semi-nude photograph used on the *Midnight* album *Sweet Death and Ecstasy*, and

2. Digitally mocked-up T-shirt images featuring Plaintiff's body and likeness used to promote and sell four merchandise designs online From May 2022 until June 2024.

### 1. Unauthorized Use of Plaintiff's Image on the Midnight Album

54

304. In May 2017, Plaintiff participated in a private inspiration shoot. During that shoot, Eric Horval photographed Plaintiff partially undressed for personal reference only. Plaintiff never granted permission—verbally or in writing—for commercial use of any images from that shoot.

305. In willful disregard of Plaintiff's rights, Defendants incorporated one of these photographs into the physical album artwork for *Midnight's* Sweet Death and Ecstasy, without her knowledge, identifying Plaintiff by her full legal name, labeling her an "Aggressor," and distributing the image globally with the album's release December 2017.

306. This photograph was used to promote a band signed to Defendants' label, circulated with physical and online album sales, and monetized by Defendants and their subsidiaries.

307. It was also used to threaten Mary's financial stability within her professional career for trying to report Eric Horval for abuse, not knowing their family was associated with the same police department the Plaintiff was speaking to.

## 2. Retaliatory Sexualized T-Shirt Campaign (May 2022–June 2024)

308. Beginning in May 2022—immediately after Plaintiff's Maryland criminal matter was closed—Defendants escalated their conduct by creating and publishing digitally mocked-up T-shirt photographs featuring Plaintiff's body and likeness for commercial sale.

309. Defendants used a photograph Eric took years earlier of Plaintiff wearing a blank shirt, and digitally imposed sexually explicit, violent, and degrading artwork onto Plaintiff's body to create merchandise mock-ups displayed on Hells Headbangers' website.

310. These mocked-up images were used to promote four specific designs, each tied to a band represented or distributed by Defendants:

**1. Nunslaughter — "Rotten Cunt"**
Depicts a nude, flayed corpse with a snake emerging from its vagina, advertised by Defendants on their Hellsheadbangers.com website, with a digital mocked-up photograph of Plaintiff wearing the shirt.

**2. Nunslaughter - "The Bog People"**
Depicts a corpse hanging by a noose over a bog; advertised by Defendants on their Hellsheadbangers.com website, with a digital mocked-up photograph of Plaintiff wearing the shirt.

**3. Profanatica — "Desecrated"**
Depicts sexualized religious violence imagery; advertised by Defendants on their Hellsheadbangers.com website, with a digital mocked-up photograph of Plaintiff wearing the shirt.

**4. Witchtrap — "Evil Strikes Again"**
Depicts an Evil witch face emerging from the front, advertised by Defendants on their Hellsheadbangers.com website, with a digital mocked-up photograph of Plaintiff wearing the shirt. Marketed between 2022–2024 using an Instagram post showing an effigy wearing Plaintiff's real jacket, connecting Plaintiff to the sexualized and violent imagery and weaponizing her personal property in furtherance of the promotion.

## B. Commercial Exploitation and Dissemination

311. Defendants sold the album and all four sexually explicit T-shirts through:
    - HellsHeadbangers.com,
    - Defendants' online webstore,
    - social media channels,
    - third-party distributors,
    - tour merchandise tables, and
    - promotional advertising platforms.

312. Defendants benefited financially and reputationally from the unauthorized use of Plaintiff's image. The album and associated merchandise were sold nationwide and internationally through Defendants' commercial platform, Hells Headbangers Records, and affiliated distributors.

313. These uses constitute classic "advertising" and "trade" purposes strictly prohibited by Civil Rights Law §§ 50–51 absent written consent.

## C. Retaliatory Timing Establishes Malice

314. Defendants began exploiting Plaintiff's likeness for T-shirt sales only after:

    - Plaintiff reported sexual assault;
    - the Maryland criminal matter closed;
    - Defendants learned no further charges were pending;
    - And Plaintiff relocated for safety but had not sold her property.

315. The timing shows the shirts were intended to sexually humiliate and retaliate against Plaintiff for reporting the crime, not coincidental merchandising decisions.

316. These acts were intentional and malicious. Defendants knew Plaintiff's livelihood depended on her reputation in the fashion and music industries, and knew publication of a sexually explicit image containing her full legal name would expose her to humiliation, reputational harm, professional damage, and retaliation from Defendants' large online audience, including individuals known for misogynistic, violent, and extremist conduct.

317. Defendants also weaponized the image as part of a larger campaign of digital harassment, including the creation of sexually explicit and derogatory mock-up t-shirts and merchandise featuring Plaintiff's likeness, intended to ridicule, shame, humiliate, and degrade Plaintiff while inciting Defendants' fanbase to further target and stalk her. These products were marketed, sold, or displayed through Defendants' business entities, including Hells Headbangers Records and Shadow Kingdom Records.

## D. Harm and Damages

318. Defendants' conduct also violates Civil Rights Law § 51, which provides a private right of action for injunctive relief and damages where a person's name, portrait, picture, or likeness is used within the State of New York for commercial or advertising purposes without consent. Plaintiff

is entitled to compensatory damages, injunctive relief, exemplary damages, and attorneys' fees where appropriate.

319.    As a direct and proximate result of Defendants' publication and commercial exploitation of Plaintiff's sexually explicit image and likeness, Plaintiff has suffered severe emotional distress, humiliation, reputational injury, and loss of professional opportunities. Plaintiff experienced panic episodes, medical deterioration, symptoms consistent with PTSD, physical illness, and significant professional harm.

320.    Defendants' misconduct was willful, wanton, malicious, and in conscious disregard of Plaintiff's rights and dignity, thereby justifying an award of punitive damages.

321.    Plaintiff demands judgment against Defendants for compensatory damages, statutory damages, punitive damages, injunctive relief permanently prohibiting Defendants from using or distributing Plaintiff's name or likeness in any form, the removal of all infringing materials from circulation, and such other relief as this Court deems just and proper.

### FOURTH CAUSE OF ACTION
### Abuse of Process
### Board of Educ. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397 (1975),
### *Eric Horval*

322.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Legal Process Was Issued at Eric Horval's Direction

323.    This cause of action arises under New York common law of Abuse of Process, as recognized by the New York Court of Appeals in *Board of Educ. v. Farmingdale Classroom Teachers Ass'n*, 38 N.Y.2d 397 (1975), which holds that a claim lies where a party:

(1) employs regularly issued legal process;
(2) with an intent to harm, coerce, or retaliate, rather than for its legitimate purpose;
(3) causing the plaintiff damages.

324.    Defendants repeatedly misused police processes in Ohio to retaliate against Plaintiff for reporting abuse and attempting to flee into hiding. These actions included:

i.      Repeatedly filing knowingly false, inflated, or manipulated police reports;
ii.     Supplying fabricated statements to law enforcement;
iii.    Provoking unnecessary baseless law enforcement inquiries designed to intimidate Plaintiff, undermine her credibility, damage her reputation, and deter her from seeking legal protection.

325.    Defendants further threatened to publish these police reports online, and in multiple communications stated that they intended to "use these reports" against Plaintiff to shame, discredit, or silence her. Defendants' intent was not to seek legitimate protection from law enforcement, but to weaponize the legal process to punish Plaintiff for reporting sexual assault, domestic violence, and harassment.

### B. Eric's Purpose Was Retaliatory, Not Legitimate

57

326. Defendants' misuse of legal process was not isolated but part of a coordinated pattern of retaliation, including the timing of reports immediately following Plaintiff's attempts to sever contact, obtain medical care, or report abuse; the coordinated spreading of the reports to third parties; and Defendants' use of these reports in their March 2 and March 4, 2022 YouTube videos to bolster defamatory accusations.

327. Eric did not initiate these filings for any proper or legitimate purpose.
Instead, as alleged throughout this Complaint, Eric filed police complaints and documents **solely to retaliate against Plaintiff** for reporting abuse, to intimidate her, and to create a false narrative to be deployed later in YouTube videos and public smears.

328. **310.** These filings were made *immediately* after Plaintiff's own protected disclosures to law enforcement. On **March 2, 2022**, within hours of learning that Plaintiff reported him for sexual assault, Eric filed a retaliatory police report in Medina, Ohio, containing knowingly false and misleading statements.

329. Eric's police report was not made in good faith, but rather:

- to create a written "record" he could later point to as "proof" in his public videos;
- to discredit Plaintiff's report before it could be investigated;
- to threaten Plaintiff with criminalization should she continue to report abuse; and
- to weaponize law enforcement as a tool of coercion and reputational destruction.

330. This satisfies the second element of abuse of process — intent to harm without justification.

### C. Eric Misused the Process *After* It Was Issued

331. After causing the issuance of these police reports and legal processes, Eric misused them for purposes outside the legitimate scope of law enforcement and in a manner amounting to perversion of process, including:

- extracting information from the police report and feeding it to his brother, who then used it in the March 2 and March 4, 2022 YouTube videos;
- directing Justin to recite and brandish the police report as "proof" that Plaintiff was lying;
- mischaracterizing the nature and content of the police report publicly;
- using the existence of the report to intimidate Plaintiff into silence;
- representing the police report as "evidence" in a public smear campaign;
- attempting to interfere with Plaintiff's ability to seek protection or medical care;
- using the police process as a tool to induce public humiliation and retaliatory harassment.

332. This misuse — particularly the repurposing of police process as a YouTube weapon — constitutes *exactly* the type of "perversion of process after it is issued" that New York law recognizes as abuse of process.

### D. The Process Was Used to Achieve a Collateral Objective

333. Eric did not use the process for any legitimate criminal or civil purpose.
Instead, he used the process for the collateral objective of:
- destroying Plaintiff's credibility,
- creating a fabricated narrative of instability and dishonesty,
- discouraging Plaintiff from pursuing legal action,

- justifying future stalking or harassment,
- threatening Plaintiff with counter-accusations,
- turning the police report into defamatory content, and
- manipulating third parties to join in harassing and defaming Plaintiff.

334. The legal processes Defendants invoked—including police documentation, incident filings, and law enforcement interventions—were all "regularly issued process" under New York Abuse of Process doctrine, because the tort does not require arrest or litigation; it extends to any misuse of governmental process for an improper motive.

335. Defendants acted with the improper purposes of coercion, retaliation, intimidation, reputation destruction, and psychological control over Plaintiff. Their intent was to humiliate Plaintiff publicly, deter her from pursuing protective orders, and retaliate for her allegations of sexual assault and abuse.

336. This satisfies the third required element — use of process to achieve a purpose outside its intended scope.

### E. Plaintiff Suffered Harm as a Result

337. As a direct and foreseeable result of Defendants' abuse of legal process, Plaintiff suffered severe emotional distress, reputational harm, professional losses, and deterioration of her physical and mental health, and was compelled to seek repeated emergency medical and legal interventions.

338. Eric's conduct was willful, malicious, and in conscious disregard of Plaintiff's rights. Punitive damages are therefore warranted.

339. Plaintiff seeks compensatory damages, punitive damages due to Defendants' malicious and retaliatory misuse of the legal process, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
### Civil Conspiracy to Commit Tortious Acts
### Common Law; Coordinated Defamatory, Retaliatory, and Harassing Conduct
*Against All Defendants*

340. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Civil Conspiracy as a Theory of Joint Liability

341. While New York does not recognize civil conspiracy as an independent cause of action, New York courts recognize that a conspiracy claim may be pleaded to connect multiple defendants to the underlying torts and to impose joint and several liability where defendants acted in concert to commit actionable tortious conduct. See *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968 (1986).

### B. The Agreement and Coordinated Scheme

342. Defendants Eric Horval and Justin Horval, together with their affiliated business entities including Hells Headbangers Records and Shadow Kingdom Records, entered into an agreement and coordinated scheme to harm Plaintiff through a series of intentional torts, including:

59

(a) The publication of defamatory YouTube videos on March 2 and March 4, 2022;
(b) The creation, manipulation, and commercial distribution of a sexually explicit images and digital depictions of Plaintiff without consent.
(d) Coordinated stalking, Surveillance, and Harassment;
(e) The filing and dissemination of false or misleading police reports;
(f) Emotional and psychological abuse; and
(g) Misuse of law enforcement processes to intimidate, retaliate against, and silence Plaintiff.

343. These acts were undertaken with the shared purpose of harming Plaintiff.

### C. Defendants Acted Pursuant to a Unified Plan to Injure Plaintiff

344. Defendants acted pursuant to a shared plan and mutual understanding, seeking to discredit Plaintiff, retaliate against her for reporting abuse, undermine her professional reputation, and induce public harassment, humiliation, and isolation. Their coordinated actions formed a unified pattern intended to inflict reputational, emotional, and financial harm.

345. Defendants acted pursuant to a mutual understanding and coordinated plan designed to:

- discredit Plaintiff publicly;
- retaliate for Plaintiff's reports of sexual assault and abuse;
- undermine Plaintiff's professional reputation;
- isolate Plaintiff socially and professionally;
- incite public harassment and humiliation; and
- cause significant emotional, reputational, and financial harm.

346. These actions created a unified pattern of coordinated misconduct carried out by multiple defendants acting together.

### D. Overt Acts Taken in Furtherance of the Conspiracy

347. In furtherance of their conspiracy, Defendants performed numerous overt acts, including but not limited to:

- Eric's retaliatory March 2, 2022 police filing, which supplied the false narrative Justin would later broadcast.

- Justin's March 2 and March 4, 2022 YouTube videos, repeating Eric's narrative and using police filings to "prove" Plaintiff was lying.
- The March 22, 2022 JOABA Podcast, where Justin repeated, expanded, and amplified fabricated claims about Plaintiff, directly tying the statements back to Eric.
- Publication of sexualized images and mocked-up T-shirt photos, created by Eric and distributed by affiliated entities to humiliate Plaintiff and bolster Defendants' campaign.
- Coordinated dissemination of defamatory narratives to music industry associates, customers, podcast hosts, social media commenters, and online communities.
- Interstate harassment and stalking, synchronized between Eric and Justin, and facilitated by shared information communicated through family members and business partners.

348.    Each defendant knowingly performed overt acts in furtherance of the conspiracy, including but not limited to:

- drafting, recording, editing, and publishing defamatory videos;
- distributing Plaintiff's sexually explicit image on commercial merchandise;
- filing false police reports and threatening their publication;
- weaponizing their online audiences against Plaintiff;
- coordinating stalking and harassment;
- disseminating false narratives to third parties in the music scene;
- attempting to destroy Plaintiff's credibility and career opportunities Domestically and Internationally.

349.    Each overt act constituted an intentional tort under New York law, including defamation, intentional infliction of emotional distress, abuse of process, invasion of privacy, publication of sexually explicit images, and stalking/harassment.

350.    These overt acts demonstrate a sustained, coordinated conspiracy in which each Defendant knowingly contributed to the overall tortious scheme.

### E. Defendants Are Jointly and Severally Liable for Underlying Torts

351.    Because the above conduct constitutes a conspiracy to commit underlying torts — including defamation, intentional infliction of emotional distress, harassment, misuse of police process, stalking, public disclosure of private facts, and unauthorized use of likeness — each Defendant is jointly and severally liable for all damages resulting from the conspiracy, even where individual acts were performed by only one Defendant.

### F. Damages

352.    As a direct and proximate result of Defendants' concerted actions, Plaintiff suffered:

- severe emotional distress;
- reputational destruction within her professional communities;
- deterioration of mental and physical health;
- humiliation and public ridicule;
- financial losses;
- loss of business opportunities; and
- ongoing fear for safety.

351.    As a direct result of Defendants coordinated conspiracy and joint participation in the tortious scheme, Plaintiff suffered severe emotional trauma, reputational destruction, economic loss, the deterioration of professional relationships, medical crises, and significant psychological injury.

352.    Because Defendants acted jointly and in concert, each Defendant is jointly and severally liable for the full measure of Plaintiff's damages arising from the torts committed in furtherance of the conspiracy.

353.    Plaintiff seeks compensatory damages, punitive damages for Defendants' willful, malicious, and coordinated misconduct, and such other relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Prima Facie Tort — Common Law; Intentional, Malicious Harm Without Justification
### *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314 (1983)
*Against All Defendants*

354.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Legal Standard

355.    This cause of action arises under New York common law of prima facie tort, which provides a remedy where a defendant intentionally inflicts harm through otherwise lawful acts committed with *disinterested malevolence* and without any legitimate justification — meaning the *sole* motive is to injure the plaintiff — and where such conduct results in special damages. See *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314 (1983).

### B. Elements of Prima Facie Tort

356.    The elements of prima facie tort are:

- Intentional infliction of harm;
- Special damages;
- Lack of excuse or justification; and
- Acts that would otherwise be lawful if not motivated solely by malice.

### C. Defendants' Conduct Was Driven by Pure Malice

357.    Defendants engaged in a long-term, coordinated campaign of conduct intended solely to injure Plaintiff, including—but not limited to:

- public humiliation,
- coordinated online harassment,
- manipulation and weaponization of Plaintiff's private information,
- retaliatory smear campaigns,
- nonconsensual publication of sexual and semi-nude images,
- dissemination of false narratives,
- exploiting Plaintiff's vulnerabilities for coercive control, and
- misuse of police processes for retaliatory purposes.

358.    These actions collectively demonstrate a deliberate, malicious intent to cause Plaintiff substantial harm.

### D. Acts That Would Otherwise Be Lawful, But Were Weaponized to Harm Plaintiff

357.    Many of Defendants' actions—such as posting YouTube videos, sharing private information, circulating imagery, communicating with third parties, and engaging in online commentary—while not independently actionable as standalone torts, were performed with the sole motive of harming Plaintiff.

360.    Defendants' behavior satisfies the "disinterested malevolence" requirement because these actions were performed exclusively to injure Plaintiff, destroy her reputation, and retaliate for her truthful reports of sexual assault and abuse.

62

358.     Defendants engaged in a long-term campaign of malicious conduct intended solely to injure Plaintiff, including—but not limited to—public humiliation, coordinated harassment, manipulation of Plaintiff's private information, retaliatory online smear campaigns, nonconsensual publication of sexually explicit images, dissemination of false narratives, misuse of police processes, and exploitation of Plaintiff's vulnerabilities for psychological control.

### E. No Justification or Legitimate Reason

359.     Defendants' conduct had no legitimate motive or valid justification. Their actions were not taken to protect any legal right, business necessity, or lawful interest. Rather, Defendants acted out of retaliation for Plaintiff reporting sexual assault, leaving the abusive relationship, and attempting to protect herself and her child.

### F. Intent to Destroy Plaintiff's Life, Opportunities, and Safety

360.     Defendants intentionally sought to destroy Plaintiff's reputation, professional opportunities, mental health stability, and personal safety. Their coordinated and escalating actions were calculated to isolate Plaintiff, undermine her credibility, and publicly shame her.

361.     Their coordinated acts were calculated, escalating, and executed to isolate Plaintiff and inflict maximum injury.

### G. Special Damages

362.     As a direct and proximate result of Defendants' malicious conduct, Plaintiff suffered special damages, including:

> (a) loss of income and professional opportunities;
> (b) deterioration of business relationships in the New York fashion and music communities;
> (c) medical costs arising from trauma-related conditions;
> (d) relocation expenses; and
> (e) other quantifiable economic losses.

363.     Defendants' acts were committed willfully, maliciously, and with reckless disregard for Plaintiff's rights, satisfying the intent element of prima facie tort.

### H. Malicious Intent and Entitlement to Punitive Damages

364.     Defendants' actions were willful, malicious, and taken with reckless disregard for Plaintiff's rights, safety, and well-being. The conduct satisfies the intent element of prima facie tort under New York law and warrants an award of punitive damages.

### I. Damages

365.     Plaintiff seeks compensatory damages, special damages, punitive damages due to Defendants' malicious intent, and such other and further relief as the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
### Aiding and Abetting Tortious Conduct
### Common Law; Participation in and Facilitation of Defamation, IIED,

63

**Abuse of Process, and Invasion of Privacy**
***Kaufman v. Cohen*, 307 A.D.2d 113 (1st Dep't 2003)**
*Against All Defendants*

366.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

## A. Legal Standard

367.    This cause of action arises under New York common law doctrine of aiding and abetting, which holds a defendants liable for tortious conduct committed by another where the defendants:

(1) had actual knowledge of the primary wrong; and
(2) provided substantial assistance in its commission

See *Kaufman v. Cohen*, 307 A.D.2d 113 (1st Dep't 2003)

## B. Defendants Had Actual Knowledge of Each Other's Wrongdoing

368.    As alleged throughout the Complaint, each Defendant had actual knowledge of the tortious conduct committed by the others. This knowledge is demonstrated by:

- ongoing communication and shared planning among Defendants;
- joint access to Plaintiff's private information and imagery, which was later published and manipulated;
- coordinated timing of YouTube videos, social media posts, and product promotions;
- use of shared business platforms to distribute defamatory, harassing, and sexualized content;
- coordination regarding the filing, sharing, and misuse of police reports; and
- joint participation in the retaliatory smear campaign following Plaintiff's disclosures of abuse.

## C. Defendants Provided Substantial Assistance to Each Other

369.    Defendants substantially assisted one another in carrying out multiple torts, including defamation, intentional infliction of emotional distress, abuse of process, invasion of privacy, and publication of sexually explicit images.

370.    Substantial assistance included, but was not limited to:
- Allowing joint use of business media channels (YouTube, merchandise platforms, social media accounts),
- Providing content, editing, production, and distribution assistance for the defamatory videos, Assisting in creating, manipulating, and publishing sexually explicit images of Plaintiff,
- Participating in online harassment and encouraging followers to target Plaintiff,
- Amplifying each other's defamatory statements and false narratives,
- Sharing and coordinating the use of fabricated police documentation,
- Contributing information and resources to defame, intimidate, and retaliate against Plaintiff.

## D. Defendants' Assistance Was a Substantial Factor in the Commission of the Torts

371.    Defendants' concerted actions substantially assisted each other in committing torts that they could not, or would not, have accomplished individually. Their collaborative efforts magnified the harm inflicted upon Plaintiff and increased the reach and impact of the wrongful acts.

372.    Their combined efforts:
- amplified the reach of defamatory publications,
- enabled broader circulation of sexualized images,
- increased the credibility of false narratives,
- intensified the emotional and psychological harm inflicted on Plaintiff, and
- facilitated the misuse of police process and retaliatory conduct.

373.    By participating in and furthering this coordinated scheme, each Defendant bears joint and several liability for the full extent of the injuries caused.

### E. Damages

374.    As a direct and proximate result of Defendants' aiding and abetting tortious conduct, Plaintiff suffered severe emotional distress, reputational injury, professional losses, economic harm, and significant degradation of her mental and physical health.

375.    Because all Defendants knowingly participated in, facilitated, and furthered the tortious conduct, each Defendant is jointly and severally liable for the full extent of Plaintiff's damages.

376.    Plaintiff seeks compensatory damages, punitive damages for Defendants' knowing facilitation of malicious conduct, and such further relief as this Court deems just and proper.

### EIGHTH CAUSE OF ACTION
### Harassment and Stalking
### Common Law; Pattern of Intentional, Targeted, and Repeated Conduct
*Against All Defendants*

377.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Legal Standard

378.    This cause of action arises under New York common law, which recognizes a civil claim for harassment and stalking where a defendant engages in a persistent, intentional, and targeted pattern of conduct intended to intimidate, threaten, terrorize, humiliate, or emotionally injure the plaintiff, and where such conduct causes severe mental, emotional, and psychological harm.

379.    While harassment is addressed primarily in the criminal context under N.Y. Penal Law §§ 240.25, 240.26, 240.30, and 240.45, New York courts permit a civil claim where the defendant's repeated conduct:

(1) serves no legitimate purpose;
(2) is intended to annoy, alarm, threaten, or harm the plaintiff;
(3) invades the plaintiff's privacy and personal security; and
(4) results in emotional, psychological, or physical injury.

### B. Stalking Incidents Beginning in 2022 through 2024

65

380. Beginning in early 2022, and long before and after Plaintiff attempted to flee abuse and relocate for safety, Defendants initiated a pattern of locating, following, monitoring, and surveilling Plaintiff in Ohio, New York, Maryland and Internationally. They used both direct pursuit and third-party intermediaries to track Plaintiff's location and retaliate for her reports of sexual assault and domestic violence. Defendants engaged in a persistent, escalating, and coordinated pattern of harassment and stalking against Plaintiff over multiple years, including:

(a) repeated physical surveillance and monitoring of Plaintiff's movements;
(b) covert tracking using technology intended to observe or follow Plaintiff without her consent;
(c) repeated threats and retaliatory communications;
(d) the publication of defamatory and degrading YouTube videos designed to mobilize public harassment;
(e) dissemination of personal and private information;
(f) coordinated online harassment through Defendants' fanbase and associates;
(g) humiliation campaigns including sexually explicit imagery;
(h) misuse of police reports intended solely to threaten, intimidate, or silence Plaintiff;
(i) ongoing communication with Plaintiff's professional contacts to damage her business relationships; and
(j) targeted attempts to isolate, frighten, and psychologically destabilize Plaintiff.

### C. Defendants Shared Plaintiff's Location and Coordinated Harassment

381. Around these dates, Plaintiff received confirmation from Amber "Winter", who admitted that Defendant's wife, Lindsey Horval (Hoover), knew Plaintiff's precise location when she was out of the country, although not disclosed online or publicly to anyone.

This admission demonstrates:

- Defendants had real-time access to Plaintiff's movements
- They shared Plaintiff's location among themselves and associates
- The stalking events were intentional and coordinated
- Defendants' monitoring of Plaintiff continued even while she was residing or traveling out of state.

382. This conduct constitutes stalking under New York and common-law standards.

### D. Harassment by Defendants' Associates Designed to Intimidate Plaintiff

383. Musician Will Rahmer, resident of Yonkers, New York, a known associate of Defendants, targeted Plaintiff with intimidation, spreading hostile and defamatory commentary online.

### F. Harassment When Plaintiff Attempted to Return to Her Property

384. Throughout 2023, 2024, and 2025, Plaintiff was repeatedly followed, monitored, and targeted each time she attempted to visit her Medina property to:
- assess the condition of her house, or
- arrange rental
- arrange and oversee maintenance projects.

385. Associates and neighbors of the Medina community began searching for Mary online to harass her and her son.

66

386.    Associates and neighbors in the Medina community began falsely calling police on Mary.

387.    Police confirmed she was being antagonized to provocation, in June and October 2025 yet offered no remedy but to "talk" to the other parties in the Medina community.

### G. Harassment Continued Into 2025, Including Attempts to Interfere With Plaintiff's Records

388.    The stalking and harassment continued into 2025, including the intentional creation of false or misleading records by The Medina, Ohio "code enforcement" agency, abusing the agency's discretion, process and authority and which resulted in additional online defamation of Plaintiff in both 2022 and 2025 causing additional fear, confusion and prolonged affects of PTSD.

389.    The Medina agency is now being sued for these tortuous actions in the Ohio Court of Claims, case # 2025-00870AD.

390.    These actions directly contributed to the ongoing pattern of targeting Plaintiff whenever she attempted to stabilize her property or address trespassing concerns.

391.    The repeated nature of the conduct—occurring across multiple states, platforms, and time periods—demonstrates a sustained and intentional effort to pursue, monitor, intimidate, and harm Plaintiff, satisfying common-law standards for civil stalking and harassment.

392.    Defendants' misconduct was willful, wanton, malicious, and in conscious disregard of Plaintiff's safety and dignity, justifying an award of punitive damages.

### H. Defendants' Conduct Was Intentional, Malicious, and Without Justification

393.    Defendants' conduct was deliberate, malicious, and intended to cause intimidation, fear, humiliation, and emotional distress.

394.    Their actions lacked any legitimate purpose and were part of a retaliatory hate campaign following Plaintiff's reports of sexual assault, domestic violence, abuse, and exploitation.

### I. Damages

395.    As a direct and proximate result of Defendants' harassment and stalking, Plaintiff suffered:

- severe emotional distress,
- fear and trauma,
- damage to her mental health,
- loss of enjoyment of property,
- relocation costs,
- interference with personal safety,
- economic losses,
- and ongoing anxiety about further surveillance.

396.    Plaintiff seeks compensatory damages, punitive damages, injunctive relief preventing any further harassment or contact, and such additional relief as this Court deems just and proper.

### NINTH CAUSE OF ACTION
### Permanent Injunction / Equitable Relief — CPLR § 6301; Ongoing and Irreparable Harm

67

*Against All Defendants*

397.   Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Plaintiff Faces Irreparable Harm Without Injunctive Relief

398.   This cause of action seeks permanent injunctive relief pursuant to CPLR § 6301 and New York common law, which authorizes courts to restrain conduct where a defendant's actions cause ongoing or imminent irreparable harm and where monetary damages alone are inadequate to prevent continued injury.

399.   Defendants have engaged in a persistent and escalating campaign of harassment, defamation, stalking, publication of sexually explicit images, misuse of police process, and coordinated intimidation, as alleged throughout this Complaint.

400.   Defendants' acts have caused, and continue to cause, irreparable harm to Plaintiff, including:

(a) ongoing emotional trauma and psychological injury;
(b) deterioration of mental and physical health;
(c) continuing reputational damage in Plaintiff's professional communities;
(d) fear for personal safety and the safety of her child;
(e) exposure to targeted harassment by Defendants' associates and online followers; and
(f) invasion of privacy through the repeated misuse of Plaintiff's name, likeness, and personal information.

### B. Defendants' Conduct Is Continuing and Likely to Persist Without Court Intervention

401.   As detailed throughout this Complaint, Defendants have continuously:

- stalked and tracked Plaintiff across state lines;
- disseminated her private information;
- used her image without consent;
- created defamatory and sexualized content;
- coordinated third-party harassment;
- interfered with Plaintiff's ability to use or inspect her property; and
- attempted to intimidate Plaintiff through retaliatory filings, online publications, and public smears.

402.   These acts did not cease even after Plaintiff filed police reports, pursued protective orders, or initiated legal action. Defendants' conduct continued through 2023, 2024, and into 2025, demonstrating a clear likelihood that Defendants will continue their harmful acts unless permanently restrained by this Court.

401.   These actions are ongoing and continuing, and Defendants have demonstrated a clear and present likelihood of repeating or escalating this harmful conduct.

### C. Plaintiff Has No Adequate Remedy at Law

402.   Plaintiff has no adequate remedy at law because monetary damages cannot:

68

(a) prevent continued publication of defamatory or sexually explicit materials;
(b) stop Defendants' repeated harassment and stalking;
(c) safeguard Plaintiff's personal safety;
(d) repair the ongoing reputational destruction; or
(e) prevent future misuse of Plaintiff's image, police reports, or private information.

### D. Plaintiff Is Likely to Succeed on the Merits of Her Claims

403.    Plaintiff has demonstrated a likelihood of success on the merits of her underlying tort claims —
including defamation, intentional infliction of emotional distress, invasion of privacy,
unauthorized use of likeness, abuse of process, conspiracy, and aiding and abetting — based on:

- explicit admissions in the Defendants' own publications;
- the March 2 and March 4, 2022 YouTube videos;
- the retaliatory T-shirt campaign and album cover;
- stalking incidents and corroborating admissions;
- police reports filed in bad faith by Defendants; and
- the documented pattern of coordinated harassment spanning multiple years.

### E. Balancing the Hardships Strongly Favors Plaintiff

404.    The balance of equities overwhelmingly favors Plaintiff. Granting the injunction will:
- protect Plaintiff's safety,
- prevent further psychological harm,
- preserve Plaintiff's property rights, and
- halt further exploitation of her image.

405.    Defendants will suffer no legitimate hardship from being prohibited from engaging in unlawful
conduct. Injunctive relief merely requires Defendants to stop violating Plaintiff's rights.

### F. Requested Permanent Injunctive Relief

403.    Unless enjoined, Defendants will continue their pattern of harassment, intimidation, defamation,
stalking, retaliation, and exploitation of Plaintiff's likeness. Defendants' conduct shows a
sustained and deliberate disregard for Plaintiff's safety, dignity, privacy, and legal rights.

404.    Permanent injunctive relief is necessary to prevent future harm and to protect Plaintiff against
further violations of her rights. Plaintiff therefore requests that this Court enter an order
permanently enjoining Defendants from:

(a) publishing or republishing defamatory statements concerning Plaintiff;
(b) disseminating, posting, selling, or otherwise exploiting Plaintiff's name, likeness, or
sexually explicit images;
(c) contacting Plaintiff directly or indirectly;
(d) engaging in further harassment, stalking, or surveillance;
(e) disseminating false or misleading police reports;
(f) encouraging third parties to harass, intimidate, or threaten Plaintiff;
(g) interfering with Plaintiff's professional relationships; and
(h) retaliating against Plaintiff further, for pursuing legal remedies.

405.    Plaintiff further requests an order requiring Defendants to:

69

(a) remove and delete all existing defamatory publications;
(b) remove sexually explicit images from all platforms and possession;
(c) return or destroy all images, files, or media containing Plaintiff's likeness;
(d) cease all unauthorized commercial use of Plaintiff's image; and
(e) refrain from any future exploitation or publication of Plaintiff's private information.

### G. Necessity of Court Supervision

406.    Given the persistent and escalating nature of Defendants' conduct, only a permanent injunction issued by this Court will ensure Plaintiff's safety, autonomy, emotional well-being, and property rights.

406.    Plaintiff seeks permanent injunctive relief, along with such additional equitable or legal relief as the Court deems just and proper.

### TENTH CAUSE OF ACTION
### Negligent Supervision and Negligent Retention
### Common Law; Against Corporate Defendants
### *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159 (2d Dep't 1997)
*Against All Defendants*

407.    Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Legal Framework

408.    This cause of action arises under New York common law, which recognizes that an employer or business entity may be held liable for negligent supervision and negligent retention where it:

(1) knew or should have known of an employee or agent's propensity to engage in harmful, dangerous, or tortious conduct;
(2) failed to take appropriate steps to supervise, control, or remove that individual; and
(3) the failure to supervise or remove was a proximate cause of plaintiff's injuries.

See *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159 (2d Dep't 1997).

### B. Corporate Defendants Employed or Authorized Eric and Justin Horval

409.    Defendants Hells Headbangers Records, Shadow Kingdom Records, Chase Horval and any affiliated business entities (collectively, the "Corporate Defendants") employed, supervised, or permitted Justin Horval and Eric Horval to act on their behalf in the operation of media platforms, merchandise creation, digital imagery, online channels, publication resources, and customer-facing communications.

### C. The Corporate Defendants Knew of Eric and Justin's Dangerous Propensities

410.    The Corporate Defendants knew or reasonably should have known that Eric and Justin had a propensity to engage in violent, abusive, defamatory, retaliatory, invasive, and harassing behavior. This knowledge was evident from:

(a) their history of abusive conduct toward Plaintiff;
(b) prior incidents of intimidation, stalking, or erratic behavior;

70

(c) internal communications referencing Plaintiff in degrading terms;
(d) Defendants' shared involvement in creating sexualized and retaliatory imagery;
(e) their repeated publication of defamatory content using business media channels;
(f) their misuse of the labels' platforms to mobilize online harassment;
(g) the commercial distribution of Plaintiff's sexually explicit image;
(h) their involvement in false or retaliatory police reports; and
(i) their escalating retaliatory behavior following Plaintiff's reports of abuse.

411.   This knowledge imposed a duty to act.

### D. Corporate Defendants Failed to Supervise, Discipline, or Remove Eric and Justin

412.   Despite actual or constructive knowledge of these propensities, the Corporate Defendants failed to supervise, restrict, discipline, or remove Eric and Justin from positions where they could use business platforms, resources, or authority to cause harm to Plaintiff.

413.   Instead, the Corporate Defendants allowed and enabled Eric and Justin to misuse business infrastructure, including:

(a) YouTube and social media channels operated under the labels;
(b) merchandise and distribution platforms;
(c) internal production equipment used to create and disseminate defamatory videos;
(d) business branding used to elevate the visibility of false statements;
(e) the labels' online customer base and mailing lists;
(f) commercial storefronts selling sexually explicit images of Plaintiff; and
(g) the labels' reputation and reach within the extreme-metal community.

414.   This materially facilitated the harm.

### E. The Corporate Defendants' Failures Proximately Caused Plaintiff's Injuries

415.   The Corporate Defendants' negligent supervision and negligent retention directly enabled, permitted, and amplified the tortious acts committed by Eric and Justin, including:

- defamation,
- intentional infliction of emotional distress,
- publication of sexualized images,
- harassment and stalking, and
- retaliatory misuse of police processes.

416.   The Corporate Defendants owed Plaintiff a duty to supervise their agents in a manner that would prevent foreseeable harm to individuals targeted through their platforms and commercial systems. Their failure to exercise reasonable supervision was negligent, reckless, and in conscious disregard of Plaintiff's safety.

### F. Damages

417.   As a direct and proximate result of the Corporate Defendants' negligent supervision and negligent retention, Plaintiff suffered severe emotional distress, reputational destruction, humiliation, invasion of privacy, financial loss, professional harm, and ongoing fear for her personal and familial safety.

418.   Plaintiff seeks compensatory damages, punitive damages due to Defendants' reckless disregard for her safety and dignity, and such other relief as the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Public Disclosure of Private Facts
### Common Law; Unauthorized Disclosure of Intimate, Sensitive, and Highly Personal Information
#### *Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993)
*Against All Defendants*

419.   Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

## A. Legal Standard

420.   This cause of action arises under New York common law, which recognizes a tort for Public Disclosure of Private Facts where a defendant:

> (1) Gives publicity to a matter concerning the private life of another
> (2) The matter publicized is highly offensive to a reasonable person; and
> (3) Is not of legitimate concern to the public.

See *Howell v. New York Post Co.*, 81 N.Y.2d 115 (1993).

## B. Defendants Publicly Disclosed Plaintiff's Private, Intimate, and Highly Sensitive Information

421.   Defendants publicly disclosed intimate, deeply private, and highly sensitive information concerning Plaintiff's personal life and her son, including:

- details of Plaintiff's sexual assault,
- Plaintiff's medical trauma,
- Plaintiff's personal history and relationship background,
- internal and confidential police and investigative information,
- Plaintiff's private messages and communications,
- Plaintiff's mental health symptoms and trauma responses,
- Plaintiff's location, residential history, and property whereabouts, and
- nonpublic information about Plaintiff's personal life and safety concerns.

422.   These facts were repeatedly weaponized for harassment, humiliation, and retaliation.

## C. Unauthorized Publication Private Information in You Tube Videos

423.   Defendants disclosed these private facts through the publication of YouTube videos on March 2, 2022, March 4, 2022, March 22, 2022.

424.   These disclosures were made without Plaintiff's consent, were highly offensive and inaccurate, and violated Plaintiff's fundamental right to privacy. The information disclosed concerned matters of Plaintiff's personal life that she reasonably expected to remain confidential and were never intended for public consumption.

425.   The details Defendants publicized are not newsworthy and bear no legitimate public interest. The disclosures served no lawful purpose and were instead designed to retaliate against Plaintiff for

72

reporting abuse, undermine her credibility, damage her professional reputation, humiliate her publicly, and incite harassment.

426.     Defendants' public disclosure of these private facts foreseeably exposed Plaintiff to ridicule, judgment, and emotional devastation within her personal, professional, and artistic communities. The disclosures further placed Plaintiff in danger by revealing personal information to individuals known to engage in threatening or extremist conduct.

## D. Unauthorized Publication of Private Information to Business Associate William Rahmer

427.     These highly offensive and inaccurate disclosures were also made to mutual business associate, William Rahmer, without provocation or consent, interfering with prospective apparel licensing contract.

428.     The disclosures served no lawful purpose and were instead designed to retaliate against Plaintiff for further harm her music and apparel career.

429.     As a direct and proximate result of Defendants' unauthorized disclosures, Plaintiff suffered retaliatory threats by William Rahmer and total loss of the contract and connection.

## E. Unauthorized Publication of the 2017 Semi-Nude Photograph

430.     In 2017, Plaintiff participated in a private inspiration shoot that included a semi-nude photograph. Plaintiff never consented to its public release or commercial use.

431.     Defendants published the photograph, along with Plaintiff's full legal name, as album art for *Midnight's* "Sweet Death and Ecstasy," making the private image publicly available to thousands of purchasers and online viewers.

432.     This constituted the public dissemination of an intimate, private, humiliating fact wholly unrelated to any matter of public concern.

## F. Disclosure of Private Sexualized Depictions and Mock-Ups

433.     Beginning in May 2022 through June 2024, Defendants created and distributed digitally manipulated images of Plaintiff's body to market sexualized merchandise, including the:

- Nunslaughter "Rotten Cunt" design,
- "Bog People" design,
- Profanatica "Desecrated Nuns" design, and
- Witchtrap "Evil Strikes Again" design.

434.     These mocked-up images used Plaintiff's body and likeness to visually associate her with sexual themes, violence, degradation, and religious desecration. Plaintiff never consented to these disclosures, and they served no legitimate public purpose.

## G. The Disclosures Were Highly Offensive and Served No Legitimate Purpose

435.     The disclosed facts were not matters of public interest, newsworthiness, or legitimate commentary. They involved:

- sexual victimization,
- trauma,
- medical history,
- private images,
- confidential police matters,
- personal location,
- and intimate personal details.

436. A reasonable person would find these disclosures highly offensive and deeply invasive.

### H. Defendants Acted with Malice and Intent to Humiliate

437. Defendants published these private facts with the intent to:
- humiliate Plaintiff,
- retaliate for her disclosures of abuse,
- cause emotional harm,
- destroy Plaintiff's credibility,
- mobilize harassment, and
- intimidate Plaintiff into silence.

438. This satisfies the malice element.

### I. Damages

439. As a direct and proximate result of Defendants' public disclosure of private facts, Plaintiff suffered: severe emotional distress, humiliation, exacerbation of PTSD symptoms, reputational destruction, professional harm, social isolation, and the deterioration of her physical and mental health.

440. Defendants acted willfully, maliciously, and in conscious disregard of Plaintiff's right to privacy, justifying an award of punitive damages.

441. Plaintiff seeks compensatory damages, special damages, punitive damages, injunctive relief prohibiting further disclosure of private facts, and such additional relief as the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
### Gender-Motivated Violence Act
### NYC Administrative Code § 10-1101 et seq.
*Against All Defendants*

442. Plaintiff repeats and realleges all preceding paragraphs as though fully set forth herein.

### A. Legal Standard

443. The New York City Gender-Motivated Violence Act ("GMVA"), N.Y.C. Admin. Code § 10-1101 et seq., creates a civil cause of action for any person injured by a crime of violence motivated by gender, defined as:

1. an act that would constitute a misdemeanor or felony under New York law;
2. committed because of the victim's gender; and
3. committed, at least in part, due to animus based on gender.

74

444.    The GMVA authorizes compensatory damages, punitive damages, attorney's fees, and injunctive relief. N.Y.C. Admin. Code § 10-1104.

444.    Under § 10-1104(a), a plaintiff may recover damages, including punitive damages, for any act of violence or threat of violence committed "because of gender or on the basis of gender," where the act constitutes a "crime of violence," including sexual assault, coercion, intimidation, physical battery, stalking, harassment, or threats of bodily harm.

### B. Defendants' Conduct Constituted Gender-Motivated Violence

445.    Defendants engaged in acts of sexual violence, coercive control, intimidation, harassment, humiliation, and retaliatory conduct that were motivated, at least in substantial part, by Plaintiff's gender.

446.    Defendants' conduct included:

- sexual assault of Plaintiff;
- unwanted physical contact and sexual touching;
- sexualized coercion;
- retaliatory humiliation after Plaintiff resisted or reported the abuse;
- weaponization of sexualized imagery to degrade Plaintiff;
- online campaigns portraying Plaintiff as sexually immoral, unstable, or deserving of violence;
- nonconsensual exposure of Plaintiff's semi-nude and private images;
- creation and publication of sexualized T-shirt designs depicting violence, degradation, and misogynistic themes tied to Plaintiff;
- using the "Sweet Death and Ecstasy" album cover, featuring Plaintiff semi-nude, to publicly sexualize and humiliate her;
- mocking, degrading, and targeting Plaintiff with gendered slurs and misogynistic statements;
- stalking and harassment triggered by her attempts to obtain safety;
- employment of misogynistic tropes to discredit Plaintiff's abuse disclosures; and
- retaliation rooted in gender-based dominance and control.

### C. The Acts Alleged Qualify as "Crimes of Violence" Under GMVA

445.    Defendants' conduct was motivated in substantial part by Plaintiff's gender, as evidenced by:

(a) the use of sexualized insults and degrading language;
(b) the non-consensual use of Plaintiff's nude or semi-nude image;
(c) threats and retaliation tied specifically to Plaintiff's identity as a woman;
(d) coercion and violence used to control Plaintiff sexually and emotionally;
(e) public humiliation designed to reduce Plaintiff's credibility as a woman reporting abuse;
(f) Defendants' attempts to undermine Plaintiff's autonomy and personhood; and
(g) the retaliatory smear campaign launched after Plaintiff reported sexual assault.

### D. Defendants' Conduct Was Motivated by Gender-Based Animus

446.    Defendants' conduct was committed because Plaintiff is a woman, as demonstrated by:

75

- the explicitly sexualized nature of the humiliation;
- the use of Plaintiff's female body as an object for commercial exploitation;
- targeting Plaintiff's sexual history, trauma, and boundaries;
- framing Plaintiff's abuse disclosures as hysteria, instability, or manipulation;
- the retaliatory design of misogynistic merchandise;
- gendered slurs, insults, and stereotypes embedded in their online commentaries;
- the explicit intent to shame, degrade, and silence Plaintiff as a woman;
- and the perpetrators' reliance on gendered power dynamics to intimidate and retaliate.

447. The retaliatory creation of sexually explicit T-shirts after Plaintiff reported the assault uniquely evidences gender-based animus, as the content weaponized Plaintiff's gender and sexuality for the purpose of public humiliation.

### E. The Gender-Motivated Conduct Caused Severe Harm

448. Defendants' violent conduct, although occurring in part outside New York, was expressly intended to—and did—cause injury within New York City, satisfying NYC Admin. Code § 10-1104(b), which permits suit when the harm occurs or continues within New York City.

449. As a direct and proximate result of Defendants' gender-motivated violence, Plaintiff suffered:

- severe emotional distress;
- fear, trauma, and PTSD symptoms;
- humiliation and degradation;
- reputational harm in her professional communities;
- economic losses;
- loss of safety;
- deterioration of mental health;
- disruption of her life and ability to work; and
- ongoing fear of further retaliation

450. Defendants' online harassment, sexually explicit publications, defamatory videos, and coordinated attacks were directed into New York City and foreseeably caused actionable harm in New York City, including deterioration of Plaintiff's mental health, professional damage within the NYC fashion and music industries, and ongoing emotional distress.

446. The GMVA expressly authorizes injunctive relief, compensatory damages, punitive damages, and the recovery of attorney's fees and costs. Defendants' conduct was intentional, malicious, reckless, and in conscious disregard of Plaintiff's rights, entitling Plaintiff to punitive damages under § 10-1104(a)(3).

447. Plaintiff seeks compensatory damages, punitive damages, injunctive relief, attorney's fees, costs, and any other and further relief the Court deems just and proper under the Gender-Motivated Violence Act.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, jointly and severally, as follows:

1. On the First Cause of Action (Defamation / Defamation Per Se):
   Compensatory damages, special damages, and punitive damages in an amount to be determined at trial.

2. On the Second Cause of Action (Intentional Infliction of Emotional Distress):
   Compensatory damages and punitive damages.

3. On the Third Cause of Action (Civil Rights Law §§ 50–51):
   Statutory damages, compensatory damages, punitive damages, and injunctive relief requiring removal of all unauthorized images and prohibiting future use of Plaintiff's name or likeness.

4. On the Fourth Cause of Action (Abuse of Process):
   Compensatory and punitive damages.

5. On the Fifth Cause of Action (Civil Conspiracy):
   Compensatory and punitive damages.

6. On the Sixth Cause of Action (Prima Facie Tort):
   Compensatory damages, special damages, and punitive damages.

7. On the Seventh Cause of Action (Aiding and Abetting Tortious Conduct):
   Compensatory and punitive damages.

8. On the Eighth Cause of Action (Harassment and Stalking):
   Compensatory and punitive damages, and injunctive relief.

9. On the Ninth Cause of Action (Permanent Injunction):
   A permanent injunction restraining Defendants from:

   (a) contacting Plaintiff;
   (b) publishing or republishing any defamatory statements;
   (c) using, distributing, or exploiting Plaintiff's image or likeness;
   (d) engaging in any harassment, stalking, or surveillance;
   (e) disseminating police reports or private information; and
   directing the immediate removal of all defamatory or sexualized content.

10. On the Tenth Cause of Action (Negligent Supervision / Retention):
    Compensatory and punitive damages.

11. On the Eleventh Cause of Action (Public Disclosure of Private Facts):
    Compensatory damages, punitive damages, and injunctive relief.

12. On the Twelfth Cause of Action (Gender-Motivated Violence Act):
    Compensatory and punitive damages, attorney's fees, costs, and injunctive relief pursuant to NYC Admin. Code § 10-1104.

13. Attorney's fees and costs where allowable by statute or common law.

14. Such other and further relief as the Court deems just, proper, and equitable.

Dated: November 20th, 2025
Brooklyn, New York

Respectfully Submitted,

Mary Moe; pro se
Address confidentiality ordered, File 327053
Kings County Family Court

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
*260 Adams Street Brooklyn, NYC 11201*

| | | |
|---|---|---|
| **MARY AMBER MARY** | ) | Index # 520441/2025 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | <u>AMENDED VERIFIED COMPLAINT</u> |
| | ) | |
| | ) | <u>LIST OF EXHIBITS</u> |
| **Eric M. Horval** | ) | |
| **Justin Horval** | ) | |
| **Hells Headbangers Records** | ) | |
| **Shadow Kingdom Records** | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

Now comes the Plaintiff, MARY AMBER MARY (herein after, "Mary"),

hereby and herein attaches their List of Exhibits to this Amended Verified

Complaint, which is incorporated by reference herein.

**Exhibit 1** – June 17 2023 Flier - Savage Master - TV Eye Brooklyn NY - SKR Sponsors

**Exhibit 2** – August 24th 2017 – MetalSucks.net – Published Article titled, "*An Open Letter to Hells Headbangers Records to Stop Releasing and Distributing Metal by White Supremacists*"

**Exhibit 3** – March 2nd, 2022 – Justin Horval / J-Dawg – Published YouTube Video & Transcript titled, "*Wild and Slanderous Hells Headbangers accusations addressed with straight facts by J-dawg!*"

**Exhibit 4** – March 4th, 2022 – Justin Horval / J-Dawg – Published YouTube Video & Transcript titled, "*SLOPPY HIT JOB on Hells Headbangers destroyed by ARREST REPORT of Unwell Accuser!*"

**Exhibit 5** – Recent screen grab of HellsHeadbangers.com e-commerce webstore with extensive distribution of New York based band, Mortician & Will Rahmer, Yonkers resident.

**Exhibit 6** – Hells Headbangers Instagram promoting the band Warmoon lord and Werewolf records whom the Defendants manufacturer and distribute their propaganda.

**Exhibit 7** – April 2022 – New York Customs Border Patrol Record of Sworn Statement by Ville Markkanen, member of Warmoon Lord.

**Exhibit 8** – September 8th 2022 – Communication from Will Rahmer to Mary

79

**Exhibit 9** – June 20th, 2024 Kings Family Court Order of Protection for Mary

**Exhibit 10** – June 20th, 2024 Kings Family Court Address Confidentiality Order for Mary

**Exhibit 11** – July 18th 2024 Kings Family Court Hearing Transcript filed with the court

**Exhibit 12** – December 2017 – Band - *Midnight, "Sweet Death and Ecstasy"* back cover image and corresponding insert.

**Exhibit 13** – May 23rd, 2018 – Police report – Spilled Lunch

**Exhibit 14** – May 29th, 2018 – Eric Horval – Property Deed – 6744 Ballash Road

**Exhibit 15** – May 30th 2018 – Eric Horval – Police Report – Implicating Mary

**Exhibit 16** – May 29th, 2019 – Mary – Property Deed – 949 Westland Drive

**Exhibit 17** – June 2020 – Mary's son's sworn Statement of events and wooden block.

**Exhibit 18** – March 2021 - Mary's son's 911 call and corresponding Police Report

**Exhibit 19** – March 2nd, 2022 – Police Report – Eric Horval – Implicating Mary

**Exhibit 20** – April 16th, 2022 – Police Report – Eric Horval – Implicating a woman of fraud he stole $130k from.

**Exhibit 21** – March 4th, 2022 – MetalSucks.net – Published article titled, "*Hells Headbangers Co-Owner Eric Horval Accused of Rape and Abuse, Brother and Co-Owner Justin Horval Says, "There's Zero Truth To It Whatsoever*"

**Exhibit 22** – March 15th, 2022 – Easy E – Comment made on Metalsucks.net article

**Exhibit 23** – March 22nd, 2022 – Video and Transcript - JOABA Podcast – Published on YouTube titled, "*JOABA episode 37 with JUSTIN of HELLS HEADBANGERS aka J-DAWG – YouTube*"

**Exhibit 24** – Screen grabs of various accounts continuing to harass Mary online related to the Defendants.

**Exhibit 25** – Stalking by Abigail Barcenas-Bargman and her connection to Amber Barcenas (Winter).

**Exhibit 26** – Nunslaughter "Rotten Cunt" shirt using Mary's image illegally and Hells Headbangers.com webpage displaying it for sale.

**Exhibit 27** – Nunslaughter "The Bog People" shirt using Mary's image illegally and Hells Headbangers.com webpage displaying it for sale from 2022 to June 2024.

80

**Exhibit 28** – Profonatica "Desecrator" shirt using Mary's image illegally and Hells Headbangers.com webpage displaying it for sale from 2022 to June 2024.

**Exhibit 30** – WitchTrap "Evil Strikes Again" shirt using Mary's image illegally and Hells Headbangers.com webpage displaying it for sale from 2022 to June 2024.

**Exhibit 31** – WitchTrap – Instagram – Eric Horval with artists displaying Mary's old jacket on their monster. Eric's clothing mirrors this effigy and it is interpreted as a display of his true alter ego – 2024.

**Exhibit 32** – Screen shots of Mary's private profile and comments made by Shana Gant Local Medina, OH resident.

**Exhibit 33** – August 17th, 2023 – SSA – PTSD Determination – Mary Moe

**Exhibit 34** – September 24th, 2024 – Dr. Kato – Letter

**Exhibit 35** – December 13th, 2024 – Dr. Roa – Psyche Evaluation for Vocational Rehabilitation

**Exhibit 36 –** August 2025 complaint to OH Court of Claims – Political subdivision targeting.

**Exhibit 37 -** April 8 2023 email from Amber "Winter" confirming Defendant's wife was tracking Plaintiff's locations internationally.

**Exhibit 38 -** Facebook post by Lauri Pentilla, associate of Defendant's stating Plaintiff should be "murdered".


Dated: Brooklyn, New York

November 20th, 2025


Respectfully submitted,


/s/ *Mary Moe*
Mary Moe
Plaintiff, pro se
*Address Confidentiality*
King County, NY File # 327053

81

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
*260 Adams Street Brooklyn, NYC 11201*

| | | |
|---|---|---|
| **MARY MOE** | ) | Index # 520441/2025 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | <u>VERIFICATION</u> |
| | ) | |
| | ) | |
| **Eric M. Horval** | ) | |
| **Justin Horval** | ) | |
| **Hells Headbangers Records** | ) | |
| **Shadow Kingdom Records** | ) | |
| | ) | |
| | ) | |
| Defendants | ) | |

STATE OF NEW YORK SS:
COUNTY OF KINGS

Now comes the Plaintiff, Mary Moe (herein after, "Mary or Ms. Moe"),

Being duly sworn, deposes and says:
I am the Plaintiff in the above captioned action. I have read the foregoing Amended Verified Complaint and know the contents thereof. The same is true to my knowledge, except as to the matters herein stated to be alleged upon information and belief, which matters I believe to be true.

Dated: November 20th, 2025
Brooklyn, New York

Sworn to before me this
_____day of November, 2025

Respectfully submitted,

/s/ Mary Moe_____,
Plaintiff, pro se
*Address Confidentiality*
Kings Family Court, NY File # 327053

82